**Lydia H. GROTTI a/k/a Lydia Grotti, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–04–406–CR.**

Court of Appeals of Texas, Fort Worth.

Nov. 17, 2006.

Richardson, Stoops, Richardson & Ward, Gary L. Richardson and Keith A. Ward, Tulsa, Cotton, Schmidt, L.L.P., Brian D. Esenwein, Fort Worth, for Appellant.

Anderson, Smyer & Riddle, L.L.P., Geffrey W. Anderson, Fort Worth, Robert A. Freyer, Jr., Asst. Dist. Atty., Houston, for State.

PANEL A: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

**OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW**

TERRIE LIVINGSTON, Justice.

Pursuant to rule of appellate procedure 50, we have reconsidered our previous opinion on the State's petition for discretionary review. *See* Tex.R.App. P. 50. We withdraw our judgment and opinion dated September 14, 2006 and substitute the following primarily to revise the factual sufficiency standard of review to comport with the court of criminal appeals's opinion in *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App. 2006), which was handed down after our original opinion issued.

## I. INTRODUCTION

A grand jury indicted appellant Lydia H. Grotti ("Grotti"), a former physician at John Peter Smith Hospital ("JPS") in Fort Worth, for the murder of her patient, Lettie McGhee ("McGhee"). The indictment alleged that Grotti murdered McGhee by occluding McGhee's endotracheal tube ("ET tube") with her finger. A jury subsequently acquitted Grotti of murder and manslaughter but convicted her of the state jail felony of criminally negligent homicide and affirmatively found that she used her finger as a deadly weapon. The trial court sentenced Grotti to two years' confinement. Grotti raises seven issues on appeal, including arguments that the evidence is insufficient to demonstrate that McGhee was alive at the time Grotti occluded McGhee's ET tube and that she caused McGhee's death. Whether McGhee was alive when Grotti occluded the ET tube is the critical issue in this homicide prosecution. Because we hold that the evidence is factually insufficient to show that McGhee was alive when Grotti occluded McGhee's ET tube, we reverse the trial court's judgment and remand the case for a new trial.

## II. FACTUAL AND PROCEDURAL BACKGROUND

McGhee, a sixty-four-year-old obese woman, visited JPS on the night of Decem-

ber 24, 2000, and into the following day. She complained of constant abdominal pain occurring over the previous three weeks, coughing occurring over the previous two to three weeks, and nausea. JPS staff subsequently conducted a number of exams on McGhee before sending her home on December 25, 2000. The impression from her radiology report indicated "possible mucinous or serous cystadenocarcinoma of an ovary with possible metastases to the liver and chest." In other words, physicians opined that McGhee had metastatic ovarian cancer that had spread to her liver and lungs and to some of her bones.

McGhee returned to the JPS emergency room (the "ER") sometime in the early evening on the following day complaining of a persistent cough. She waited to be treated in the ER after JPS staff appropriately triaged her. Approximately two hours later, McGhee's daughter approached Leigh Taylor, an emergency medical technician ("EMT") working at the ER front desk, and told Taylor that she needed help because something was wrong with her mother. Taylor looked into the waiting room and observed McGhee slumped over in a wheelchair. Taylor determined that McGhee was unresponsive, did not have a detectable pulse, and showed no observable signs of life. With the help of a triage nurse and a male technician, Taylor transported McGhee back to a trauma room within a few minutes and began a "code," which was documented on a "code sheet."[1] The code sheet indicates that McGhee was "found" at 19:45 and that efforts to resuscitate her began at 19:48.[2] McGhee had suffered a cardiac arrest.[3]

Taylor, Donald McGraw, M.D., Alan Eli, M.D., Jennifer Lovins, a registered nurse, Kim Short, an EMT, Michelle Martin, a registered nurse, Donna Duclow, a registered nurse, Eva Murray, an ER charge nurse, Christi Bergland, an ER charge nurse, and Dennis Hunt, a respiratory therapist, all participated in the code and immediately began full Advanced Cardiac Life Support ("ACLS")—the performing of cardiopulmonary resuscitation ("CPR"), the delivery of drugs through an IV, intubation, and defibrillation. Specifically, the code team hooked McGhee up to an electrocardiogram monitor at 19:48 to determine her heart rhythm, which was initially identified as ventricular fibrillation ("V-fib").[4] Dr. Eli intubated McGhee at 19:57 by inserting an ET tube to establish an airway to facilitate McGhee's breathing process. The code team administered defibrillation (electrical shocks) fifteen times over the course of the entire code. This occurred twice at 19:48, once at 19:50 and 19:51, twice at 19:52, once at 20:00, 20:02, and 20:04, twice at 20:08, once at 20:10,

1. Janice Zimmerman, M.D., an expert witness who testified for the State, described a "code" as a resuscitation effort. "[I]n simplified terms ... you have a patient who has a condition that if you don't do something they probably are likely to die. But you have an opportunity to intervene and reverse that process or treat it effectively."

2. Like McGhee's medical records, all time references in this opinion are based on a 24–hour clock.

3. James Cox, M.D., an expert witness who testified on behalf of Grotti, described a cardi-

ac arrest as a complete stopping of the heart, causing respiratory and circulatory failure. A heart attack, conversely, occurs when there is "blockage of an artery in the heart and a piece of heart muscle dies," but the heart continues to beat.

4. V-fib is chaotic or irregular electrical activity of the heart in which the heart pulsates, but does not beat, pump, or perfuse. Ventricular tachycardia ("V-tach") and pulseless electrical activity ("PEA") are other forms of irregular electrical heart activity.

twice at 20:12, and once at 20:13. The code team also administered seven doses of epinephrine and multiple doses of lidocaine, atropine, dopamine, and a dose of amniarodone, all of which were intended to stimulate the heart and obtain or raise blood pressure.

McGhee had no detectable blood pressure or pulse and took no spontaneous respirations[5] for the first twenty-seven minutes of the code, according to the code sheet. McGhee's rhythm was either V-fib, V-tach, or PEA during this period. At 20:08, McGhee's rhythm was "asystole," meaning an absence of any electrical activity in the heart.[6] At 20:16, the code team palpated a pulse[7] and detected a heart rate of ninety beats per minute. McGhee established a "sinus" rhythm at 20:18 and was put on a ventilator.[8]

Once McGhee was exhibiting a sinus rhythm and was stabilized to a certain extent, Dr. McGraw called Grotti to consult with her regarding admitting McGhee to the Intensive Care Unit ("ICU").[9] Grotti arrived at the ER shortly thereafter to assess McGhee and to determine whether she should be transferred to the ICU. McGhee, however, lost a sinus rhythm and a pulse. At 20:34, McGhee's code sheet indicated that her rhythm was PEA and that she did not have a palpable pulse.

Dr. McGraw explained that they had been working the code for about forty-five minutes, and Grotti commented that McGhee had "lost any chance at recovery" and that McGhee was either brain dead or that she would probably be pronouncing McGhee brain dead the following morning or within twenty-four hours. Grotti concluded that McGhee was not stable enough for transfer to the ICU, and she returned to the ICU with instructions to call her if McGhee became stable.

Dr. McGraw continued the code after Grotti returned to the ICU. McGhee once again regained a sinus rhythm and a palpable pulse with a heart rate of ninety-seven beats per minute. Dr. McGraw summoned Grotti a second time to return to the ER and assess McGhee for admission to the ICU. Shortly before 20:50, Grotti returned and assumed care of McGhee, and Dr. McGraw left the trauma room to attend to other patients.

Grotti assessed McGhee. McGhee still did not have a blood pressure, and she did not have a radial or femoral pulse. Grotti did, however, detect a carotid pulse, but she described it as "thready"[10] before announcing to the code team that it had "gone away." Grotti ended, or "called," the code and discontinued the IV, discon-

---

5. A person's breathing is "spontaneous" when the body itself is doing the breathing without the assistance of artificial machines, that is, when the breathing is self-generated.

6. This is generally referred to as a "flat line"; the heart is doing nothing.

7. A pulse is "palpable" when it can be felt, usually on the carotid or femoral artery.

8. A "sinus" rhythm is a normal heart rhythm. According to Dr. Cox, although a sinus rhythm suggests a pulse and a heartbeat, it does not demonstrate effective perfusion, which indicates that the heart is effectively pumping blood to the organs and tissues.

9. Grotti was one of two attending physicians in the JPS ICU at the time. She had attended the University of Texas's medical school in Houston and had completed a family practice internship, an internal medicine residency, and a critical care fellowship thereafter. She worked in Sacramento, California as a hospitalist after her fellowship. She began working at JPS on August 1, 1997. At the time of the event, Grotti was board certified in internal medicine and critical care.

10. "Thready," according to Grotti, means weak.

nected the ventilator, and pronounced McGhee dead at 20:50 because, according to Grotti, McGhee had lost a pulse, had no spontaneous respirations, and had no blood pressure. The code sheet at this time indicated that McGhee had a "brady" [11] rhythm, a palpable pulse, a heart rate in the sixties, no blood pressure, and no respirations. The code had lasted for just over sixty minutes.

Immediately after Grotti called the code, Nurse Lovins observed McGhee's chest "rising and falling," saw condensation in the ET tube, and thought that McGhee was "breathing." Taylor, Nurse Martin, and Short also observed McGhee's chest "rising and falling" and thought that McGhee was "breathing." Grotti, however, explained that the respirations were "agonal" and testified that McGhee made no attempt to breathe after several minutes. According to Grotti,

> [t]he air from the ventilator had pushed air and the patient's lungs came out and the patient did nothing after that.... She did not make any attempt to breathe in. The air came out, it was like (gesturing) and then nothing.

Grotti reported McGhee's death to the medical examiner at 21:00 and called Life Gift at approximately 21:20.[12] She requested permission from the medical examiner to remove McGhee's ET tube because, in her opinion, the ET tube was prolonging McGhee's "agonal activity" and removal of the ET tube would naturally collapse McGhee's airway tissues inward, thus ending the agonal respirations. The medical examiner denied her permission to remove the ET tube.

Grotti then spoke to members of McGhee's family briefly before returning to the ER. There, Nurse Martin told Grotti that McGhee was "breathing," so Grotti examined McGhee once again. McGhee did not have a pulse, she did not have any heart sounds, and she had fixed eyes and dilated pupils and nonresponsive corneal reaction, which, in Grotti's opinion, indicated neurological dysfunction, particularly in the upper brain stem and lower midbrain. Grotti also examined McGhee for breath sounds because "she was making respiratory effort" and because there was condensation in McGhee's ET tube. According to Grotti, McGhee was getting air into her central airways but not into her lungs. She explained to Nurse Martin that McGhee had been hyperoxygenated and that her brain stem was continuing to fire, causing muscle contractions to open up her airway and move air. Grotti opined that McGhee was cardiopulmonarily dead and that the movements that Nurse Martin observed were agonal respirations or spinal reflexes only. Grotti described the agonal respirations as the "last gasps of a dying brain stem." Short, however, testified that she examined McGhee after Grotti called the code and that she detected a pulse in two different places. She could not identify when she detected the pulses.

Grotti examined McGhee a few more times thereafter. Although there was "some electrical activity" on the monitor, Grotti detected no heart sounds or pulses, and McGhee's "respiratory activity" became slower with each examination. Shortly before 21:50, McGhee's respirations had slowed down to three or four per minute, according to Grotti. One of the nurses asked how long this activity was

---

**11.** "Brady" is short for "bradycardia," which means a slower heart rate, usually less than sixty beats per minute. Grotti explained that she wrote "brady" because McGhee's "heart rate was bradying down, it was slowing down."

**12.** Life Gift is an organization that assists with the process of organ donation.

going to continue, and Grotti explained that "it could go on for minutes or it could go on for an hour ... because the [ET] tube was splitting her airway open."

At 21:50, Grotti occluded[13] McGhee's ET tube with her finger. McGhee's head and neck "moved" during the ET tube's occlusion. Michael Kasschau, M.D., a resident in the JPS ICU, entered the trauma room during this time and, after having spoken with Grotti for five to ten minutes, observed her occlude McGhee's ET tube for "a solid five minutes" as they continued their conversation. Dr. Kasschau recounted that Grotti told him that "this is something that she had seen done in her fellowship." Nurse Berglund entered the trauma room and also observed Grotti occluding McGhee's ET tube.

Grotti herself admitted that she occluded McGhee's ET tube. In a letter to the Texas State Board of Medical Examiners (the "Board"), Grotti stated,

> The [ET tube] was prolonging the agony for the family and the E[R] staff who wanted the patient moved somewhere else, there was no room. Instead of removing the [ET tube], which the Medical Examiner did not want us to do, I occluded the [ET tube] for approx. one minute. The agonal movements of the head and neck occurred three to four times during that minute and ceased. This occur[r]ed approx. one hour after the patient was pronounced dead, with no clinically detectable cardiac function.

McGhee's rhythm went asystole after Grotti occluded the ET tube. McGhee's death certificate lists her time of death as 20:50 on December 26, 2000. The medical examiner did not perform an autopsy, and the manner of death is listed as "natural."

Kevin Wacasey, M.D., a former ER physician at JPS, had previously expressed concerns about the JPS ER, including issues involving patient volume and patient wait times. He learned about the incident involving Grotti and McGhee on December 27, 2000, and later reported Grotti's actions that night to the Fort Worth Police Department. She was subsequently indicted for murder.

At trial, Grotti pleaded not guilty to the offenses alleged in the indictment and not true to the deadly weapon allegation. Several expert witnesses testified, offering their opinions as to whether McGhee was alive or dead when Grotti occluded McGhee's ET tube. In addition to murder and manslaughter instructions, the trial court included a criminally negligent homicide instruction in its charge to the jury. The jury ultimately convicted Grotti of criminally negligent homicide, and this appeal followed.

In addition to her evidentiary sufficiency challenges, Grotti argues that there was no evidence to prove that she committed a "gross deviation" from the standard of care, that the trial court erred by instructing the jury on the offense of criminally negligent homicide, that the prosecutor's violation of an *in limine* order was prejudicial prosecutorial misconduct, that the opinions offered by the State's experts were based on conjecture, not fact, and that her prosecution violated the constitutional prohibition against double jeopardy.

### III. SUFFICIENCY OF THE EVIDENCE—WAS McGHEE ALIVE WHEN GROTTI OCCLUDED HER ET TUBE?

In her first issue, Grotti argues that the evidence is insufficient to show that McGhee was alive when she allegedly caused McGhee's death. She states that

---

**13.** Webster's Dictionary defines "occlude" as "to shut or stop up so as to prevent the passage of something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1560 (2002).

"[i]n most homicide cases, the evidence that the decedent was alive before the homicide occurred is abundantly clear— not so in this case." Grotti contends that because the jury found that she caused McGhee's death by occluding McGhee's airway with her finger, a deadly weapon, it was the State's burden to prove that McGhee was alive at 21:50, the time of the ET tube occlusion.

A person commits criminal homicide if he intentionally, knowingly, recklessly, or with criminal negligence causes the death of an individual. TEX. PENAL CODE ANN. § 19.01(a) (Vernon 2003). The penal code defines an "individual" as a human being who is *alive. Id.* § 1.07(a)(26) (Vernon Supp.2006). A "but for" causal connection must be established between the defendant's conduct and the resulting harm. *Id.* § 6.04(a) (Vernon 2003); *Robbins v. State,* 717 S.W.2d 348, 351 (Tex.Crim.App.1986).

 A causal connection must have been established between Grotti's conduct of occluding McGhee's ET tube and the harm that allegedly resulted therefrom— McGhee's death. If McGhee was not alive when Grotti occluded her ET tube, then Grotti could not have caused her death. We therefore examine the evidence to determine if it is legally and factually sufficient to demonstrate that McGhee was alive at 21:50 so that Grotti's act of occluding McGhee's ET tube caused her death.[14]

### A. Standards of Review

 In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Hampton v. State,* 165 S.W.3d 691, 693 (Tex.Crim.App.2005). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX.CODE CRIM. PROC. ANN . art. 38.04 (Vernon 1979); *Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App.2000).

 The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App. 1997); *Bowden v. State,* 166 S.W.3d 466, 470 (Tex.App.-Fort Worth 2005, pet. ref'd). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State,* 46 S.W.3d 243, 253 (Tex.Crim. App.2001); *Malik,* 953 S.W.2d at 240. The law as authorized by the indictment means

---

**14.** Grotti initially argues that a different evidentiary standard of review should be utilized in cases in which a physician has been charged with negligent homicide arising from the treatment of a patient. She contends that we should apply the no-evidence standard of review pronounced by the Texas Supreme Court in *City of Keller v. Wilson* because there is no precedent in Texas for the application of the evidentiary sufficiency rules to cases in which physicians are charged with homicide. 168 S.W.3d 802 (Tex.2005). We decline Grotti's recommendation. This is an appeal from a criminal prosecution, not a civil trial, and until further instructed, we are bound to apply the appropriate standards of review as articulated by the court of criminal appeals as set forth herein. *See Tello v. State,* 180 S.W.3d 150, 156 (Tex.Crim.App.2005).

the statutory elements of the charged offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex.Crim.App.2000).

In contrast, when reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson*, 204 S.W.3d at 414–15; *Drichas v. State*, 175 S.W.3d 795, 799 (Tex.Crim.App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 416–417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, at 416–17.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id.* We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id.* We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim.App.1997). Unless the record clearly reveals that a different result is appropri-

ate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id.* at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003). Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground. *Goodman v. State*, 66 S.W.3d 283, 287 (Tex.Crim.App.2001); *Johnson*, 23 S.W.3d at 7.

As an intermediate court of appeals, our decisions are conclusive on all questions of fact brought before us on appeal. *See* Tex. Const. art. V, § 6; *Goodman*, 66 S.W.3d at 301–02 (Womack, J., dissenting).

**B. Definition of Death**

Because a homicide requires the death of an "individual" and the Texas Penal Code defines an "individual" as one "who is alive," the State was required to show that McGhee was alive at the time Grotti allegedly caused her death. *See* Tex. Penal Code §§ 1.07(a)(26), 19.01(a). However, the Texas Penal Code does not define the term "death" other than with respect to unborn children,[15] and the trial court did not include a definition of death in its charge to the jury. Because the

---

**15.** The penal code provides that " '[d]eath,' includes, for an individual who is an unborn child, the failure to be born alive." Tex. Penal Code Ann. § 1.07(a)(49).

nature of this specific sufficiency examination is inherently dependent upon the definition and application of the term "death," we must first determine whether the definition attributed to that term by both parties in this case would have been included in a hypothetically correct charge. *See id.* § 19.01(a); *Malik*, 953 S.W.2d at 240.

The record demonstrates that both of the parties presented evidence under the assumption that section 671.001(a) of the Texas Health and Safety Code was the applicable and appropriate definition of death to be used during trial. Titled, "Standards Used in Determining Death," section 671.001 provides in part the following:

> (a) A person is dead when, according to ordinary standards of medical practice, there is irreversible cessation of the person's spontaneous respiratory and circulatory functions.

> (b) If artificial means of support preclude a determination that a person's spontaneous respiratory and circulatory functions have ceased, the person is dead when, in the announced opinion of a physician, according to ordinary standards of medical practice, there is irreversible cessation of all spontaneous brain function. Death occurs when the relevant functions cease.

TEX. HEALTH & SAFETY CODE ANN. § 671.001(a), (b) (Vernon 2003).[16] Section 671.001(a) addresses cardiopulmonary death, and section 671.001(b) addresses brain death. *Id.* During his questioning, Grotti's counsel studiously asked numerous witnesses, without objection by the State,

to assume that the following definition of death be applied, which tracks the language of section 671.001(a) verbatim:

> A person is dead when, according to ordinary standards of medical practice, there is an irreversible cessation of the person's spontaneous respiratory and circulatory functions.

The charge included no specific instruction on the definition of death, and none was requested by either the State or appellant. There is, however, no evidence in the record that the jury considered any alternative definition of death, and neither party challenged in this appeal the definition of death used at trial nor its omission from the charge given by the trial court. *See* TEX.CODE CRIM. PROC. ANN. art. 36.14 (Vernon Supp.2006) (requiring defendant to specifically object in writing to jury charge).

While the court of criminal appeals instructs us that words not statutorily defined should be given their ordinary meanings, *Garcia v. State*, 887 S.W.2d 846, 859 (Tex.Crim.App.1994), *cert. denied*, 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995), the penal code provides that "unless a different construction [of a statutory term] is required by the context," sections 311.011, 311.012, 311.014–.015, and 311.021–.032 of the government code, known as the Code Construction Act, apply to the construction of the term. TEX. GOV'T CODE ANN. §§ 311.011, .012, .014–.015, .021–.032 (Vernon 2005); TEX. PENAL CODE ANN. § 1.05(b). Government code section 311.011 provides that "[w]ords and

---

**16.** Section 671.001 provides guidance to physicians, and others relying on those physicians' pronouncements, as to when death legally occurs in this state. *See* TEX. HEALTH & SAFETY CODE ANN. § 671.001; *Tarrant County v. Dobbins*, 919 S.W.2d 877, 883 (Tex.App.-Fort Worth 1996 writ denied) (holding that medical investigator was entitled to rely on doc-

tors' pronouncement of death under section 671.001); *see also* TEX. HEALTH & SAFETY CODE ANN. § 671.002(b) (providing that "person who acts in good faith in reliance on a physician's or registered nurse's determination of death is not liable for civil damages or subject to criminal prosecution for the person's actions.").

phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." TEX. GOV'T CODE ANN. § 311.011. Moreover, in determining what definition to apply to the term "death" in this case, we may look to sources outside the code in which the offense itself is defined. *See Ex parte Matthews,* 892 S.W.2d 208, 210–11 (Tex.App.-Houston [1st Dist.] 1995) (op. on reh'g), *aff'd,* 933 S.W.2d 134 (Tex.Crim.App.1996), *overruled in part on other grounds by Proctor v. State,* 967 S.W.2d 840, 844 (Tex.Crim. App.1998).

Section 671.001 was enacted to provide guidance to medical professionals and those relying on them in determining when death occurs. *See* note 16, *supra.* Thus, "death" has acquired a legislatively defined, technical meaning, and—in the context of a homicide prosecution of a medical professional who has been accused of causing the death of a patient in the course of performing a medical procedure—we are compelled to construe the term "death" in penal code section 19.01(a) according to this technical definition. Therefore, we hold that a hypothetically correct jury charge in this case would have included the definition of death codified in section 671.001(a) of the Texas Health and Safety Code. *See Gollihar,* 46 S.W.3d at 253; *Malik,* 953 S.W.2d at 240. Accordingly, we will use section 671.001(a)'s cardiopulmonary definition of "death" in conducting our sufficiency review. *See Gollihar,* 46 S.W.3d at 253; *Malik,* 953 S.W.2d at 240.[17]

### C. Introduction to Sufficiency Review

In most instances, the death of an individual is easily determinable, if not obvious. In this case, however, the issue of when death occurred is critical to the proper determination of the sufficiency of the evidence as it relates to causation. Accordingly, we set forth the individual testimony of each witness relevant to the issue of whether McGhee was alive or dead at 21:50 when Grotti occluded her ET tube and further organize it according to whether the witness was a fact or expert witness.

At trial, the State offered the testimony of numerous JPS employees who were involved to some extent with the events surrounding McGhee's treatment in the ER as well as the testimony of two physician witnesses who offered their expert opinions regarding, among other things, McGhee's condition at 21:50. Grotti also called a few physician expert witnesses who testified to McGhee's condition both during and after the code. As the analysis will show, only one witness, Dr. Vincent DiMaio, chief medical examiner for San Antonio, testified unconditionally that McGhee's respiratory activity after Grotti had called the code at 20:50 was sufficient to maintain life. On the contrary, multiple witnesses attributed McGhee's post–20:50 respiratory activity to her brain stem, concluding that her labored respirations were inadequate to maintain her life and that she thus had experienced irreversible cessation of her spontaneous respiratory and circulatory functions prior to 21:50, when Grotti occluded her ET tube. Consequently, we hold that the evidence showing that McGhee was not alive at 21:50 so greatly outweighs the legally sufficient evidence supporting the conviction that the

---

17. Grotti argues in her brief, and we agree, that section 671.001(a), not section 671.001(b), is the appropriate definition of death by which to examine the sufficiency of the evidence because this is a case of cardiop-

ulmonary death, not brain death, and because we are restrained by the theories and definitions used at trial when conducting our sufficiency reviews. *See Gollihar,* 46 S.W.3d at 253; *Malik,* 953 S.W.2d at 240.

jury's verdict is manifestly unjust. *See Watson,* at 413–14; *Johnson,* 23 S.W.3d at 11.

### D. Expert Physician Testimony

#### 1. Janice Zimmerman, M.D.

Dr. Zimmerman testified as an expert witness on behalf of the State. As the director of medicine emergency services at Ben Taub General Hospital in Houston, Dr. Zimmerman based her opinions on McGhee's medical records, affidavits from JPS employees, information from the Board, and a few letters, including one from Dr. Cox, one of Grotti's experts.

Dr. Zimmerman initially testified that Grotti inappropriately called the code at 20:50 because McGhee was alive. Dr. Zimmerman reasoned that McGhee was alive at 20:34, 20:35, and 20:50 because, according to the code sheet, she had a pulse. She also discussed a blood gas report that was performed at 20:15 which indicated that McGhee had a low PCO2 number of 23.3 C and a high PO2 number of 354.5 C.[18] Dr. Zimmerman discussed her understanding of the meaning of these numbers and testified as follows:

[STATE:] Now, in doing a comparison between the PO2 number and the PCO2 number and in looking at both of those at the same time, can you tell us after examining those two numbers as to whether or not this woman's lungs were functioning correctly?

[DR. ZIMMERMAN:] Well, what you can say is that she's able to exchange oxygen and carbon dioxide—

[STATE:] Okay.

[DR. ZIMMERMAN:]—across the lungs. The actual lung function's being done by the mechanical ventilator or by someone squeezing the bag. This just says she does pretty good at transfer-

ring oxygen from what they're giving her through her lungs into her bloodstream and she's getting rid of carbon dioxide. So that transfer of gases is occurring reasonably well in this lady.

Dr. Zimmerman reasoned that McGhee's condition did not fit the definition of "death" at 21:50. She opined that McGhee had blood circulation and breathed continually between 20:50 and 21:50 and that Grotti's act of occluding McGhee's ET tube deprived her of oxygen, thus stopping her breathing. Dr. Zimmerman testified that McGhee's respirations between 20:50 and 21:50 were not agonal. To her, agonal movements and agonal respirations mean "chest wall movements." She testified to the following:

[STATE:] In reviewing everything that you've reviewed, what is your opinion about the respirations that took place between 8:50 and 9:50 p.m.[?]

[DR. ZIMMERMAN:] Those are what I would call normal—well, may not be exactly normal, but the patient was breathing.

[STATE:] Okay.

[DR. ZIMMERMAN:] These are not agonal respirations.

[STATE:] Why?

[DR. ZIMMERMAN:] Agonal respirations are basically a few breaths that occur when a patient has died. It just means that part of the brain, we call a brain stem, just hasn't quite died. So there may be one, two, or three breaths. We're talking minutes at the most, not for an hour. That is not agonal respirations.

Dr. Zimmerman interpreted the head and neck movements made by McGhee when Grotti occluded her ET tube as possibly meaning that McGhee had sensed the lack

18. According to the report, "C" stands for critical.

of oxygen and consequently struggled. She reasoned that a dead person could not respond to stimulus like that. Dr. Zimmerman also attributed McGhee's fixed and dilated eyes to the medications previously administered to her.

Dr. Zimmerman further opined, however, that the presence of a pulse is considered to be the return of spontaneous circulation. "[A] pulse says there is circulation[,]" and obtaining a blood pressure is the next step. She testified that "there [is] no documentation" that McGhee had a pulse at 21:50 and that she did not have enough information to know whether McGhee's breathing was effective to sustain life at 21:50. She testified as follows:

> [DEFENSE COUNSEL:] Is it your opinion to a reasonable degree of medical certainty that at 21[:]50 Lettie McGhee had spontaneous effective respiratory and circulatory function?
>
> [DR. ZIMMERMAN:] Again, I can't answer that as a yes or no, because I'm making an assumption at that point. If she was breathing at 21[:]50[,] then she did have spontaneous respiratory function and had to have had some circulatory function to support that.
>
> [DEFENSE COUNSEL:] Okay. Now—
>
> [DR. ZIMMERMAN:] Whether it was effective or not, it was effective enough for her to be breathing. *But I am making the assumption that she was breathing at that time.*
>
> [DEFENSE COUNSEL:] Okay. But you—as I understand it, and correct me if I'm wrong, what you're saying is, you don't have enough information to know whether or not it was effective to sustain life at 21[:]50?
>
> [DR. ZIMMERMAN:] That would be correct. At that point in time I don't know that it was effective to sustain her

life much beyond that point in time. [Emphasis added.]

Thus, Dr. Zimmerman admitted that her opinion was based upon the *assumption* that McGhee was breathing at 21:50. Dr. Zimmerman also agreed that a physician who calls Life Gift would likely have a subjective belief that the patient was dead.

Dr. Zimmerman disagreed with a number of conclusions made by Dr. Cox, discussed *infra*, regarding McGhee's condition. She disagreed with Dr. Cox's opinions that McGhee was dead before the code had begun, that occluding McGhee's ET tube after 20:50 would have had no effect on McGhee because she was already dead, and that "all circulation had stopped."

## 2. Vincent DiMaio, M.D.

Dr. DiMaio also testified on behalf of the State as an expert witness. As the chief medical examiner for San Antonio, Bexar County, Dr. DiMaio based his opinions on McGhee's medical records and the affidavits of various JPS staff.

Dr. DiMaio testified that McGhee was breathing until the time of the occlusion, that McGhee was alive when Grotti occluded her ET tube, and that McGhee was dead after Grotti removed her finger from the end of the ET tube. He thus concluded that McGhee had been asphyxiated. Dr. DiMaio testified that McGhee had sufficient respiratory function at 21:50 to support life and that the movement of McGhee's head and neck during the ET tube's occlusion likely indicated that she was struggling in an effort to breathe. He understood the term agonal respirations to mean "difficulty breathing" and reasoned that a patient experiencing such respirations is still alive because the patient is breathing. He testified that the conscious desire or objective of holding one's finger

over an ET tube for five minutes would be to make absolutely sure that the person was dead.

Dr. DiMaio also based his opinion that McGhee was alive at 21:50 on Grotti's letter to the Board. As support for his opinion that McGhee was alive, he cited Grotti's statements that McGhee had a brady rhythm of thirty to sixty beats per minute, that McGhee was experiencing agonal respirations, and that McGhee's head and neck moved when she occluded her ET tube.

### 3. Donald McGraw, D.O.

Dr. McGraw was the ER physician who attended to McGhee until Grotti assumed her care (shortly before 20:50). Dr. McGraw testified that he thought McGhee was going to be transferred to the ICU once Grotti took over. Although he described McGhee's prognosis from the beginning of the code as "grim," Dr. McGraw had a "problem" with calling the code at 20:50 because according to the code sheet, McGhee had a pulse, a normal sinus rhythm, and a heart rate, conditions that he believes constitute a "successful" resuscitation. However, Dr. McGraw was not involved with McGhee's care anytime after Grotti returned to the ER and assumed McGhee's care.

### 4. James Cox, M.D.

Dr. Cox, an emergency medicine physician at Harris Methodist Hospital in Fort Worth, testified as an expert witness on behalf of Grotti. He based his opinions on McGhee's medical records, testimony given by various parties associated with the case, ACLS guidelines and "other articles," and the opinions of other experts.

Dr. Cox testified that McGhee was dead "for all practical purposes" at 19:45, when she was found in the ER waiting room, and that there was nothing on the code

sheet that suggested to him that she was alive at any point during the first twenty-seven minutes of the code. In discussing the probability of resuscitating a patient over periods of time and what occurred in this case, Dr. Cox opined that time is a "major factor." He testified as follows:

[DEFENSE COUNSEL:] What would the standards of ordinary practice suggest to you in terms of length in code versus a continuation of the code?

[DR. COX:] We know that basically every—every minute you have a ten percent less chance of survival. So in ten minutes if you're not resuscitated, [do] not have any responses from somebody, that's basically a hundred percent. In ten minutes, they're gone if you have [not] gotten them back.

[DEFENSE COUNSEL:] What about 20 minutes?

[DR. COX:] That's kind of what we do as a general rule to go 20 minutes to—we now say we know ten minutes is it, let's give it a double try. We'll do our best, and in 20 minutes if somebody is not showing a response that is it. I mean, they're not going to be coming back.

. . . .

[DEFENSE COUNSEL:] Okay. When—looking at that, can you tell us—suggest to the jury when you may have terminated the code had you been administering this code?

[DR. COX:] Probably about 20[:]08, 20[:]10 is about 20 minutes out, we're still not seeing anything going on—

[DEFENSE COUNSEL:] Okay.

[DR. COX:]—positive.

Dr. Cox reviewed McGhee's 20:15 blood gas report. He interpreted it as follows:

It tells me they did an excellent job of ventilating. They were getting oxygen

into the system and they were hyperoxygenating, the oxygen level was about three and a half times over what it normally is. But after all that time they—we're not getting a response. She was metabolically acidotic, and what that says is that the cells are dying inside. They're releasing lactic acid. They're—it's all going down hill.

For somebody to be successfully resuscitated you should be seeing PH—particularly when you get them early and get intubated and give them all the drugs, the PH should be holding up there in the pretty normal range, signs they're perfusing and getting circulation. In her case you had the oxygen but not the circulation going on so cells are dying and—and that's a sign that things are not going well and death is occurring.

Dr. Cox opined that McGhee had both respiratory and circulatory failure at 20:15, thirty minutes into the code. At 20:16, the code sheet indicates that McGhee had a palpable pulse and a heart rate of 90. Dr. Cox testified that McGhee was nevertheless still not alive. He reasoned,

If you have a palpable pulse you have some kind of pressure, but there's not one they could obtain. You can feel a pressure that's generally at the—the neck you'll—about 50 millimeters of mercury pressure you will feel it, about temporal arteries it's probably going to be 60 or 70 that you can feel. But that's not a—that's not a blood pressure you're going to have when you're alive. So the heart rate alone, a palpable pulse without the ability to get a blood pressure is—it's a good thing. I mean, you like—that's at least something, but it's not going to lead to life as such if that's all it is. If that's all you got you're still in deep trouble and the patient is not doing well.

Dr. Cox testified that the sinus rhythm that McGhee exhibited at 20:18 and 20:26, although "good," would not be sufficient to sustain her life absent a blood pressure, which was nonexistent according to the code sheet. He opined that McGhee experienced major organ failure, which caused her death, and that she was dead at 20:50, when Grotti called the code. According to Dr. Cox,

Again, we've had no response for—forever. This code has been carried on three times longer than should be done. It's—she's not shown any response. We have yet to have a blood pressure recorded, even listed no blood pressure. This is not a patient who is—is alive.

Dr. Cox also discussed brain stem function and its relation to agonal respirations. He explained that the brain stem is one of three major parts of the brain (the other two being the cerebellum and midbrain), that it is "very primitive" and "tough," and that it controls our breathing, among other things. Dr. Cox testified that the brain stem may continue to fire after a person has died, thus attempting to cause the person to breathe, and that, in his experience, it was not uncommon for a person to have agonal respirations, which he has observed last for an hour, following the discontinuation of resuscitation. He explained that agonal respirations, or "gasping-last type respirations," are the result of brain stem activity and are insufficient to effectively respirate a body because they are not deep respirations. Dr. Cox stated,

[W]hen you're breathing in you've got to move in enough air to fill up what we call the dead spaces, the mouth, the throat, the trachea, the tubes, and finally breathe in enough air to get the air adequately to the sacks of the lungs where exchange can occur. . . . [Agonal

respirations] are not going to get air out to the lungs.

Accordingly, Dr. Cox opined that McGhee was still dead at 21:50 and that the occlusion of McGhee's ET tube by Grotti did not cause or contribute to her death.

### 5. Gus Krucke, M.D.

Dr. Krucke worked as a physician in the JPS ICU with Grotti and testified on her behalf as an expert witness. Dr. Krucke opined that McGhee's arrest and death were never successfully reversed and that the code ought to have been discontinued after the first thirty minutes. Specifically, he testified that the palpable pulse and heart rate of 90 indicated at 20:16 on the code sheet does not mean that McGhee was successfully resuscitated. He opined that a sinus rhythm, which McGhee had at a few points during the code, does not translate to effective coronary perfusion because "[t]here may be electrical activity or automaticity in the heart muscle itself, but if it's not squeezing and it's not pumping appropriately then you're not providing adequate circulation and the rhythm is, therefore, ineffective." Dr. Krucke opined that McGhee was dead at 20:34 and 20:50 and that her chances of successful resuscitation at 20:50 were "zero."

Dr. Krucke testified that the fact that condensation was observed in McGhee's ET tube after the code was called would neither surprise him nor change his opinion that she was dead by 20:50. He testified that he had observed "thousands" of people die over the course of his career and that it was not uncommon for a person to have what appears to be respiration thereafter. According to Dr. Krucke,

It is not unusual in the death process to have two situations. One is, let's say, where you are withdrawing life support in a patient who still has a blood pressure and a pulse. The family's elected based on the patient's previously expressed wishes to have artificial life support measures removed and the tube is removed, and then, yes, there is respiration that eventually diminishes over time to no movement or respiration at all.

And then there's the other case of an individual who has already been declared dead who might have spinal reflexes anywhere from 30 minutes, 60 minutes, an hour and a half after the declared death but that doesn't constitute respiration.

He opined that McGhee was experiencing "spinal reflexes," not agonal respirations, when Grotti occluded her ET tube. He testified that although there is no medical reason to occlude an ET tube, Grotti's occlusion of McGhee's ET tube had no effect on McGhee.

### 6. Grotti

Much of the relevant portions of Grotti's testimony has already been detailed in the factual background section above. She testified that McGhee was never successfully revived or resuscitated at any point during the code. Grotti testified that she had never called a code when a patient had a pulse and that she called McGhee's code at 20:50 because McGhee had lost a pulse, had no spontaneous respiration, and had no blood pressure; McGhee was dead. She did not indicate on the code sheet at 20:51 that McGhee did not have a pulse because she never thought that anyone would assume that she called the code when a pulse was present. She testified that McGhee's respiratory efforts were ineffectively depositing air into her lungs after the code had been called and that she explained to Nurse Martin, who had informed her that she thought McGhee was breathing, that McGhee was cardiopulmonarily dead and was experiencing agonal

respirations. She described agonal respirations as the brain stem firing, thus causing muscle contractions in an effort to try to make the body breathe again. Grotti accordingly attributed the source of McGhee's respiratory efforts to McGhee's brain stem. She testified as follows:

> Okay. Well, when the brain stem fires it actually causes muscle contractions to try to restart the breathing—you know, the breathing action. It tries to—it causes muscle contractions in the throat, in the diaphragm, and it tries to open up the airways so it tries to extend the neck. So what is actually happening was the brain stem is firing, she's getting muscle contractions, it's opening up her airway and causing enough negative pressure to have some air move.

Grotti testified that she thought occluding McGhee's ET tube would be the equivalent of removing it because McGhee's airway would close or collapse upon the ET tube's removal. She did not hear any heart sounds, and she did not detect a palpable pulse after 20:50. She thus occluded McGhee's ET tube to stop the agonal respirations. McGhee was already dead and had no cardiopulmonary function at that time, according to Grotti.

### E. Eyewitness Testimony

#### 1. EMT Leigh Taylor

Taylor was approached by McGhee's daughter in the ER and was the first to assess McGhee. She assisted in the code until Grotti initially assessed McGhee and returned to the ICU. Dr. McGraw sent Taylor to the pharmacy at that point to retrieve medications. When Taylor returned to the ER, the code had been called, McGhee had been disconnected from the ventilator, and the nurses were "very upset."

One of Taylor's responsibilities was to "prep" McGhee so that her body could be viewed by family members before being transported to the medical examiner's office. Taylor attempted to prep McGhee "about 30 minutes" after she had returned to the ER from the pharmacy with the medications but was unable to because McGhee had a "rhythm on the monitor," her chest was "rising and falling," and she "appeared to be breathing." Taylor also observed condensation in McGhee's ET tube, which she associated with breathing. According to Taylor, "[t]he condensation—I could see moisture coming through the tube every time she would breathe—like she'd breathe in and out, her chest would rise and fall." Taylor testified that she observed this activity for fifteen to twenty minutes on three different occasions and that McGhee's "air exchange" became slower and slower with each visit. She associated the term "agonal respiration" with slow, difficult breathing, but she could not say that McGhee ever had a pulse after Grotti pronounced her dead at 20:50.

#### 2. Nurse Jennifer Lovins

Nurse Lovins participated in the entire code and entered the information on the code sheet until 20:34. She testified that McGhee had a palpable pulse at some point during the first twenty-seven minutes of the code but that she did not record it on the code sheet. She testified that she was "shocked and upset" when Grotti called the code and disconnected the ventilator because she did not think that McGhee was dead. Nurse Lovins thought that McGhee was "breathing" because McGhee's chest was rising and falling and because there was condensation in the ET tube. She questioned Dr. Eli if McGhee's "respirations" were a normal occurrence for someone who had just been taken off of a ventilator; he responded that he had never experienced it before.

Nurse Lovins opined that McGhee was alive. She said that she was "in and out" of the room a few times after Grotti called the code and that she observed McGhee's respirations "for at least 30 minutes" thereafter. She described McGhee's respirations as "regular" during this period because they were occurring at "regular intervals" and "were not labored." Nurse Lovins never palpated for a pulse after 20:50.

### 3. Nurse Paula Martin

Nurse Martin participated in McGhee's resuscitation effort too. At some point during the code, after Grotti's first visit to the ER, Dr. McGraw asked Nurse Martin to retrieve some Levophed, a drug used to raise blood pressure, because the code team had administered the maximum amount of dopamine, another blood pressure medication. When Nurse Martin returned to the trauma room, Grotti, who was standing at the head of McGhee's bed, told Nurse Martin that she did not want to use the Levophed. The ventilator had been turned off, and Nurse Martin assumed that Grotti had removed McGhee from the ventilator to determine whether she would take any spontaneous breaths. After McGhee had been off of the ventilator for a brief period, Nurse Martin asked Grotti if she planned to reconnect the ventilator. Grotti responded, "No, the patient's respirations are agonal." Nurse Martin, however, recounted that McGhee was "breathing" and that her breaths were "regular" (ten breaths per minute), "forceful," "deep," and had "enough force to cause condensation to come halfway up the end of the endotracheal tube." McGhee's respirations became less and less "forceful," however, after she was removed from the ventilator. Nurse Martin further testified that after Grotti had pronounced McGhee dead and during McGhee's "regular" breathing, someone in the room,

though she could not remember who, stated that McGhee had a pulse. Nurse Martin did not check McGhee for a pulse.

### 4. EMT Kimberly Short

Short participated in the code, primarily assisting Taylor with chest compressions. Short testified that as Grotti took McGhee off the ventilator at the conclusion of the code, Grotti stated that she "was going to have to do it in the morning anyway" and that she "would take full responsibility." Short observed McGhee "breathing" immediately after the code was called. She testified,

Ms. McGhee had an endotracheal tube, which is the tube that you put in their throat to maintain their airway and to provide oxygen to the lungs, and you can see the secretions through the ET tube as she was breathing. She had— her chest would rise and fall in a normal pattern. It didn't look like she was, you know, struggling for air.

Short testified that she observed this activity for just over an hour after Grotti called the code. She ultimately prepared McGhee's body for viewing, though she could not recall exactly when, and she testified that she felt a palpable pulse in two different locations, but she could not recall whether it was "faint" or "pounding." Short claimed to have told a nurse about the pulse, but she did not inform Grotti.

### 5. R.N./ER Manager Synthia Chandler

Nurse Chandler served as a joint manager of the ER at the time of the incident. She is a registered nurse who at the time of trial had worked at JPS for twenty-five years, twenty-two of them in the ER. She did not participate in the code, but she and her "work partner," Don Baylor, spoke with Grotti the following morning, December 27, 2000, about Grotti's act of occluding

McGhee's ET tube. During their conversation, Grotti was adamant that McGhee was dead when she occluded McGhee's ET tube, answering, "She was dead," to many of Baylor's questions. Nurse Chandler testified that agonal respirations are "sometimes" not effective respiration, that she has observed a body continue to have "reflexive action" as part of a process of death following the calling of a code, which can sometimes be caused by hyperoxygenation, and that McGhee had been hyperoxygenated. Nurse Chandler agreed that the brain stem is one of the last body functions to die off, that electrical activity may continue on the cardiac monitor after death, and that a person may occasionally have an exchange of oxygen that appears to be respiration after death.

### 6. Nurse Christi Berglund

Nurse Berglund was the charge nurse/team leader in the ER on December 26, 2000. Although she personally participated in McGhee's code only briefly, she was kept apprised of the staff's resuscitation effort as it progressed. After the code had been called, she observed Grotti standing at the head of McGhee's bed, occluding her ET tube. Nurse Berglund asked Grotti what she was doing and why. Grotti responded that she was unable to remove the ET tube because McGhee was going to be an "ME case" and that she did not want McGhee's family to be upset by the agonal movements that McGhee was exhibiting. Nurse Berglund opined that Grotti's occlusion of McGhee's ET tube "was not going to make a difference as to whether or not [McGhee] lived or died." She testified that she has "acknowledged in the past" that she observed McGhee making "chest movements" but that they were not effective to exchange air. Nurse Berglund testified as follows:

[DEFENSE COUNSEL:] Could you tell me kind of—or tell us, not just me, but kind of what you saw when you say that you saw chest movements after the code was called?

[NURSE BERGLUND:] It was just chest movements. It looked like she was trying to breathe but she just wasn't getting full chest or lung expansion. [RR6: 205]

[DEFENSE COUNSEL:] And you also are in the position, are you not, that after the code was pronounced—called and—and Ms. McGhee was pronounced deceased, her chest wasn't rising and falling normally like someone's chest rises and falls when they are breathing; is that a correct—

[NURSE BERGLUND:] No.

[DEFENSE COUNSEL:] Is that a correct statement?

[NURSE BERGLUND:] Oh, yes. I'm sorry.

. . . .

[DEFENSE COUNSEL:] Based on your experience of having been a nurse for all the years that you've been a nurse and being around and observing, it's your position, is it not, that other observers could see the activity that you saw that you say had any—could have the appearance of breathing and misinterpret it as actually being breathing?

[NURSE BERGLUND:] Yes.

Nurse Berglund described the movements that she observed McGhee making as agonal or brain stem reflexes. She testified that if McGhee was not dead when Grotti called the code, she "certainly would have been dead 25 minutes later," the point at which she believed Grotti had occluded McGhee's ET tube.

### 7. Respiratory Therapist Dennis Hunt

Hunt was the respiratory therapist assigned to the JPS ER on December 26,

2000.[19] He performed CPR on McGhee during the initial stages of the code and placed her on a ventilator at approximately 20:20. Hunt observed McGhee thereafter for five to fifteen minutes before leaving the trauma room to attend to other patients in the ER. He did not observe McGhee take any spontaneous breaths during this period. Hunt returned to the trauma room where McGhee was located when he heard the ventilator alarm sounding. Grotti had disconnected the ventilator. Hunt testified that he "didn't notice anything out of the normal" in terms of the nurses' behavior at that point, that no one objected out loud to Grotti's actions, and that no one instructed him to reconnect the ventilator. As the respiratory therapist on call in the ER, Hunt testified that he would have brought it to someone's attention if he had observed McGhee attempting to breathe after the code had been called.

### 8. Michael Kasschau, M.D.

Dr. Kasschau, a resident assigned to the ICU, arrived at JPS at 21:45 on December 26, 2000 and checked in with Grotti, who was in the ER trauma room with McGhee, at approximately 21:55. Dr. Kasschau returned to the trauma room to visit with Grotti at about 22:05.[20] Standing fifteen feet away from Grotti, he spoke with her for about five to ten minutes but was unable to see what she was doing. Dr. Kasschau then moved up to McGhee's bedside and saw Grotti occluding McGhee's ET tube with her thumb for five minutes. Dr. Kasschau observed occasional activity

on the cardiac monitor as he spoke to Grotti. He agreed that "[i]t just means that there's still electrical activity in the heart that is observable by the machine," not that there is a pulse or a perfusing heart. He had the impression at that point that McGhee had expired and that Grotti was not killing her.

### F. Sufficiency Holdings

Viewing the evidence in the light most favorable to the verdict and giving full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, we hold that a rational trier of fact could have found, based primarily on Dr. DiMaio's testimony, that McGhee was alive at 21:50, when Grotti occluded her ET tube. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Hampton*, 165 S.W.3d at 693. The evidence is thus *legally sufficient* to show that McGhee was an "individual" within the meaning of sections 1.07(a)(26) and 19.01(a) of the penal code. TEX. PENAL CODE ANN. §§ 1.07(a)(26), 19.01(a).

■ But viewing all the evidence in a neutral light, favoring neither party, and considering evidence that both supports and contradicts the verdict, we hold that the evidence is *factually insufficient* to show that McGhee was alive at 21:50. *See Watson*, 204 S.W.3d at 413–14, 416–17. Viewed objectively, the great weight and preponderance of all the evidence contradicts the verdict. *See id.* at 416–17.

We are required to perform a number of tasks upon determining that the evidence

19. Hunt is certified in Advanced Cardiac Life Support (ACLS), Cardiopulmonary Resuscitation (CPR), Pediatric Advanced Life Support (PALS), and Neonatal Advanced Life Support (NALS).

20. The timing testified to by Dr. Kasschau conflicts with other evidence showing that

Grotti occluded McGhee's ET tube an hour after she called the code, or 21:50. Regardless of the inconsistency in the times, however, there is no dispute that Grotti occluded the ET tube after calling the code and with Dr. Kasschau present in the room.

is factually insufficient to support the jury's verdict. *See Goodman*, 66 S.W.3d at 295–96 (Keller, J., concurring). We must detail the evidence—all of the evidence—relevant to the evidentiary sufficiency issue. We have done so above. We are also required to state clearly why the jury's finding is factually insufficient. *Id.* at 287. Here, the evidence that McGhee was alive at 21:50 is factually insufficient under the second ground articulated by the court of criminal appeals: there is evidence both supporting and contradicting the verdict, and weighing all of the evidence, we have determined that the contrary evidence claiming that McGhee was not alive at 21:50 so greatly outweighs the legally sufficient evidence supporting the conviction that the jury's verdict is manifestly unjust. *See Watson*, 204 S.W.3d at 413–14, 416–17. Finally, we are required to explain why the evidence that McGhee was not alive at 21:50 outweighed the evidence that McGhee was alive at 21:50. We do so below.

EMT Taylor, Nurse Lovins, Nurse Martin, EMT Short, Nurse Berglund, Dr. McGraw, and Grotti all had participated in McGhee's treatment in some manner before 21:50, when Grotti occluded the ET tube. All but McGraw testified that McGhee made respiratory efforts after 20:50, when Grotti called the code. But neither Taylor, Nurse Lovins, nor Nurse Martin testified that the activity occurred anytime beyond thirty minutes from the point at which Grotti called the code, and none of them checked for a pulse after 20:50. Short was the only witness who testified that she felt pulse after 20:50. She was not able, however, to testify to what time she felt the pulses after 20:50. Moreover, although the collective testimony of Taylor, Nurse Lovins, Nurse Martin, and Short shows that McGhee was making respiratory effort after Grotti called the code, there was no testimony from any of these witnesses that that effort was effective to maintain life or adequately exchange air.

Although Dr. Zimmerman testified that McGhee's condition did not fit the definition of death at 21:50, she also testified that a pulse is indicative of circulation and admitted that there was no documentation that McGhee had a pulse at 21:50. She further testified that she was *assuming* that McGhee was breathing and that she did not have enough information to know whether McGhee's breathing was effective to sustain her life at 21:50. In other words, she was unable to provide critical expert testimony regarding the fundamental issue in this case: Was McGhee's death due to irreversible cessation of her respiratory and circulatory functions at the time that Grotti occluded the ET tube? Her testimony therefore lacks probative weight.

Conversely, Nurse Berglund and Grotti testified that McGhee's respiratory efforts were ineffective to adequately exchange air and that she was dead before 21:50. Both described McGhee's movements as agonal-type reflexes, and Nurse Berglund explained that others could misinterpret McGhee's respiratory efforts as breathing.

Further, Dr. Cox testified extensively on the issues of life and death and opined that McGhee was dead at 19:45, 20:50, and 21:50, that McGhee's blood gas report indicated that her death was "occurring," and that McGhee had respiratory and circulatory failure at 20:15, nearly thirty-five minutes before Grotti called the code. Significantly, as Dr. Cox further pointed out, McGhee never had a blood pressure, according to the code sheet, despite being coded for over sixty minutes and being shocked fifteen times. Dr. Krucke also opined that McGhee's arrest and death, which he said occurred at 19:45, were nev-

er successfully reversed and that it was not uncommon for deceased individuals to experience spinal reflexes after death.

Dr. DiMaio was the only expert witness who unconditionally opined that McGhee was still alive at 21:50. But the overwhelming weight of the testimony regarding McGhee's respirations between 20:50 and 21:50, particularly the testimony of Dr. Cox, Dr. Krucke, Nurse Berglund, and Grotti, was that McGhee's respirations were ineffective to adequately exchange air. While Dr. Zimmerman opined that the respirations were not agonal, but instead "not normal" breaths, Dr. DiMaio reasoned that they were agonal breaths which, according to him, meant only "difficulty breathing." On the other hand, Dr. Cox, Dr. Krucke, Grotti, and Nurse Berglund attributed McGhee's post–20:50 respiratory efforts to her brain stem, which was firing in an attempt to restart her breathing process. These witnesses all agreed that this agonal breathing was insufficient to maintain life. And although she did not testify that McGhee was alive or dead at 21:50, Nurse Chandler explained that she has observed a body continue to have "reflexive action" as part of the process of death after a code has been called, which can sometimes be caused by hyperoxygenation, and that McGhee had been hyperoxygenated. Further support for the conclusions reached by Dr. Cox, Dr. Krucke, Grotti, Nurse Berglund, and Nurse Chandler is evidenced in McGhee's 20:15 blood gas report, which indicated that McGhee's PH level was below normal and that she was metabolically acidotic. This meant that although McGhee was hyperoxygenated, her circulatory function was failing, which caused the cells to release lactic acid because they were not receiving adequate oxygen.

There is no evidence that McGhee had a pulse at 21:50. The extent of the medications and defibrillations administered to McGhee, the length of the code itself, and the time at which Grotti occluded McGhee's ET tube vis-a-vis the time that she was found and the time that the code was called further support the conclusion that McGhee was dead at 21:50. Consequently, numerous witnesses thus reasoned that McGhee had met the definition of death—as found in section 671.001(a) of the Texas Health and Safety Code—before 21:50.

Accordingly, the evidence that McGhee was not alive at 21:50 so greatly outweighed the evidence that McGhee was alive at 21:50 that the jury's verdict was manifestly unjust because (1) the evidence contrary to the verdict demonstrates that McGhee experienced irreversible cessation of her spontaneous respiratory and circulatory functions prior to 21:50 and (2) her respiratory efforts between 20:50 and 21:50 were insufficient to maintain life. See TEX. HEALTH & SAFETY CODE ANN. § 671.001(a). Although there is legally sufficient evidence supporting the jury's verdict, which primarily consists of Dr. DiMaio's testimony, after viewing all of the evidence in a neutral light, and exercising our exclusive jurisdiction to determine this factual sufficiency issue, we must conclude that the evidence supporting the verdict is so outweighed by the contrary evidence that the jury's verdict was manifestly unjust.[21]

---

21. Although not entirely on point, the court in *State v. Naramore*, 25 Kan.App.2d 302, 965 P.2d 211 (1998), considered some of the same issues that we are confronted with in this case, particularly the strong expert testimony contrary to the fact finder's verdict. There, the Kansas appellate court held that the evidence was insufficient to support the physician-defendant's convictions for murder. *Id.* at 223. The court stated,

This is not a situation where the evidence in the defendant's favor is trifling. It is ex-

Because we hold that the evidence is factually insufficient to demonstrate that McGhee was alive at 21:50—because the contrary evidence is so strong—the evidence is therefore also factually insufficient to show that McGhee was an "individual" within the meaning of sections 1.07(a)(26) and 19.01(a) of the penal code. TEX. PENAL CODE ANN. §§ 1.07(a)(26), 19.01(a). Consequently, the evidence is factually insufficient to show that Grotti's act of occluding McGhee's ET tube caused McGhee's death. We sustain Grotti's first issue.

In her second issue, Grotti argues that the evidence is factually insufficient to show that she caused McGhee's death. She argues that it was McGhee's disease process that caused McGhee's death, not her act of occluding McGhee's ET tube. Grotti's argument is in the form of a factual sufficiency challenge and, if sustained, would not entitle her to any greater relief than that available to her pursuant to our factual insufficiency holding above. Moreover, her argument is based upon the presumption that McGhee was alive when Grotti occluded her ET tube. We have already determined that the evidence is factually insufficient to show that McGhee was alive when Grotti occluded her ET tube and, consequently, that Grotti did not cause her death. Therefore, any inquiry into the cause of McGhee's death based upon an underlying presumption that McGhee was alive would be unnecessary

and moot. For these reasons, we need not address this issue. See TEX.R.APP. P. 47.1.

Because Grotti's remaining issues, if sustained, would entitle her to greater relief than that afforded to her pursuant to our factual insufficiency holding, we address them below.

## IV. GROSS DEVIATION & LESSER INCLUDED OFFENSE

In her third issue, Grotti argues that there was no evidence that she committed a gross deviation from a standard of care. See TEX. PENAL CODE ANN. § 6.03(d) (Vernon 2003). She argues that no expert testified that her conduct constituted a gross deviation from a standard of care and that a lay juror could not make such a determination on the basis of mere conjecture or speculation. We also consider Grotti's fourth issue here, in which she argues that the trial court erred by instructing the jury on the lesser included offense of criminally negligent homicide. She argues that her act of occluding McGhee's ET tube was intentional, not negligent, and that she is guilty of either a different degree of homicide or none at all.

We use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser included offense. Rousseau v. State, 855 S.W.2d 666, 672–73 (Tex.Crim.App.), cert. denied, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); Royster v. State, 622 S.W.2d 442, 446 (Tex. Crim.App. [Panel Op.] 1981) (op. on reh'g).

tremely strong. When there is such strong evidence supporting a reasonable, noncriminal explanation for the doctor's actions, it cannot be said that there is no reasonable doubt of criminal guilt. This is particularly true in a situation as we are faced with here, where the only way the defendant's actions may be found to be criminal is through expert testimony, and that testimony is strongly controverted in every detail.

We do not say that a physician can always escape criminal conviction for reckless or purposeful homicidal behavior through friendly medical testimony on his or her behalf. But there is a reason why there has yet to be in Anglo–American law an affirmed conviction of a physician for homicide arising out of medical treatment based on such highly controverted evidence as here.
Id. at 223–24.

First, the lesser included offense must be included within the proof necessary to establish the offense charged. *Salinas v. State*, 163 S.W.3d 734, 741 (Tex.Crim.App. 2005). This means that the offense must comport with article 37.09 of the Texas Code of Criminal Procedure. Tex.Code Crim. Proc. Ann. art. 37.09 (Vernon 1981); *Moore v. State*, 969 S.W.2d 4, 8 (Tex.Crim. App.1998).

Second, some evidence must exist in the record that would permit a jury to rationally find that if appellant is guilty, he is guilty only of the lesser offense. *Salinas*, 163 S.W.3d at 741; *Rousseau*, 855 S.W.2d at 672–73; *Royster*, 622 S.W.2d at 446. The evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* If there is evidence from any source that negates or refutes the element establishing the greater offense, or if the evidence is so weak that it is subject to more than one reasonable inference regarding the aggravating element, the jury should be charged on the lesser included offense. *See Schweinle v. State*, 915 S.W.2d 17, 19 (Tex.Crim.App. 1996); *Saunders v. State*, 840 S.W.2d 390, 391–92 (Tex.Crim.App.1992).

A person commits criminally negligent homicide if she causes the death of another by criminal negligence. Tex. Penal Code Ann. § 19.05(a). Criminal negligence occurs when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(d). The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* It is the "failure to perceive" the risk that must rise to the level of a "gross deviation" from an ordinary standard of care. *Graham v. State*, 657 S.W.2d 99, 101 (Tex.Crim.App.1983).

The offense of criminally negligent homicide "involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof [but fails] to perceive the risk." *Stadt v. State*, 182 S.W.3d 360, 364 (Tex.Crim.App.2006) (quoting *Lewis v. State*, 529 S.W.2d 550, 553 (Tex.Crim.App. 1975)). For a defendant to be entitled to a jury charge on criminally negligent homicide, the record must contain some evidence that the defendant did not intend the resulting death or know that it was reasonably certain to occur. *Ybarra v. State*, 890 S.W.2d 98, 110 (Tex.App.-San Antonio 1994, pet. ref'd). If such evidence is present, before a charge on criminally negligent homicide is required, the record must also contain evidence showing an unawareness of the risk. *Mendieta v. State*, 706 S.W.2d 651, 653 (Tex.Crim.App.1986); *Licon v. State*, 99 S.W.3d 918, 928 (Tex. App.-El Paso 2003, no pet.); *Ybarra*, 890 S.W.2d at 110.

Criminally negligent homicide is a lesser included offense of murder. *See Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim.App.1984). Thus, the first prong under *Royster* is met. The issue here is whether there is some evidence in the record that would permit a jury to rationally find that if Grotti is guilty, she is guilty only of the lesser included offense of criminally negligent homicide.

Grotti testified that McGhee was never successfully revived or resuscitated at any point during the code, that she called the code because McGhee was dead, and that

McGhee's post–20:50 respiratory efforts were merely agonal respirations. Grotti also testified that she did not harm McGhee when she occluded McGhee's ET tube and that she did not occlude the ET tube in order to kill McGhee. The record thus contains some evidence that Grotti neither intended to cause McGhee's death nor did she know that it was reasonably certain to occur.

The obvious risk associated with occluding McGhee's ET tube is Grotti's failure to recognize that McGhee could possibly have been alive and that her occlusion of McGhee's ET tube could cause McGhee to asphyxiate. As set forth in our evidentiary sufficiency analysis above, there is evidence, primarily from Dr. DiMaio and Dr. Zimmerman, that McGhee's respiratory efforts were not agonal and that she was alive when Grotti occluded her ET tube, although Zimmerman "assumed" that McGhee was breathing. Considered along with Grotti's opinion of McGhee's condition at 21:50, this is some evidence indicating an unawareness by Grotti that McGhee could possibly have been alive at 21:50. *See Mendieta,* 706 S.W.2d at 653; *Ybarra,* 890 S.W.2d at 110. There is thus some evidence in the record that would permit a jury to rationally find that Grotti is guilty

only of the lesser included offense of criminally negligent homicide. *See Royster,* 622 S.W.2d at 446.

■ Regarding Grotti's gross deviation argument, the record demonstrates that Grotti was board certified in internal medicine and critical care and had years of emergency care experience. Dr. Zimmerman testified that she could think of no "medical or commonsensical" justification for ever occluding a patient's ET tube, and Grotti herself said that occlusion of McGhee's ET tube would have been "horrible," "extreme," and a "disregard[ ] to the normal standard of medical practice" if McGhee had been alive at the time. Notwithstanding our factual sufficiency holding above, this evidence, considered with Dr. DiMaio's opinion about McGhee's condition at 21:50 (i.e., that she was breathing), constitutes some evidence that Grotti's failure to perceive that McGhee was possibly alive was a gross deviation from an ordinary standard of care.[22] Accordingly, we overrule Grotti's third and fourth issues.

## V. Prosecutorial Misconduct— Motion for Mistrial

■ In her fifth issue, Grotti argues that the State deliberately violated an *in*

---

**22.** We also note that Grotti's argument under her third issue seems to be a challenge, though not worded as such, to the jury charge. Grotti appears to be advocating that the requirements for expert testimony and a physician-based standard of care in a civil medical malpractice case be applied in this case. There, expert testimony is required to establish the governing standard of care and to determine whether the standard has been breached. *See Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977). But here, Grotti did not assert any objection to the trial court's charge as worded, which was based upon the penal code's definition of gross deviation from the standard of care. This definition provided that the risk that the defendant fails to perceive must "constitute[ ] a gross deviation from the standard of care

that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." Tex. Penal Code Ann. § 6.03(d); *Tello,* 180 S.W.3d at 156. To the extent that Grotti makes this argument, it is unclear and waived. *See* Tex.R.App. P. 38.1(h); *Tong v. State,* 25 S.W.3d 707, 710 (Tex.Crim.App.2000), *cert. denied,* 532 U.S. 1053, 121 S.Ct. 2196, 149 L.Ed.2d 1027 (2001). Further, we cannot say that any unobjected-to charge error existed since the trial court's charge tracked the law applicable to the case. *See* Tex.Code Crim. Proc. Ann. arts. 36.14–.15 (Vernon Supp.2006), arts. 36.16–.19 (Vernon 1981); *Bluitt v. State,* 137 S.W.3d 51, 53 (Tex.Crim.App.2004); *Almanza v. State,* 686 S.W.2d 157, 171–72 (Tex. Crim.App.1985) (op. on reh'g).

*limine* order by asking a question that allegedly implicated "bad acts" evidence. She argues that the alleged violation constituted prejudicial prosecutorial misconduct and that the trial court erred by denying her motion for mistrial.

■ A mistrial is an extreme remedy for prejudicial events occurring during the trial process. *Bauder v. State,* 921 S.W.2d 696, 698 (Tex.Crim.App.1996). It is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). The asking of an improper question will seldom require a mistrial because, in most cases, any harm can be cured by an instruction to disregard. *Id.; Hernandez v. State,* 805 S.W.2d 409, 413–14 (Tex.Crim.App.1990), *cert. denied,* 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991). But a mistrial is required when an improper question or reference is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors. *Simpson v. State,* 119 S.W.3d 262, 272 (Tex.Crim.App.2003), *cert. denied,* 542 U.S. 905, 124 S.Ct. 2837, 159 L.Ed.2d 270 (2004); *Ladd,* 3 S.W.3d at 567. Only when it is apparent that an objectionable event at trial is so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant is a trial court required to grant a mistrial. *Bauder,* 921 S.W.2d at 698.

■ The denial of a motion for mistrial is reviewed under an abuse of discretion standard. *Ladd,* 3 S.W.3d at 567. The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case. *Id.* To preserve error involving prosecutorial misconduct, the defendant must (1) make a timely and specific objection, (2) request an instruction that the jury disregard, and (3) move for a mistrial. *Penry v. State,* 903 S.W.2d 715, 764 (Tex. Crim.App.), *cert. denied,* 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995); *Cook v. State,* 858 S.W.2d 467, 473 (Tex.Crim.App. 1993).

The following exchange took place during the State's cross-examination of Grotti:

[STATE:] When you pull out a patient's endotracheal tube

. . .

[GROTTI:] Right.

[STATE:] Does their airway—in somebody that is dying, does their airway collapse upon itself like you claim?

[GROTTI:] That depends on the situation. In this patient, she was completely [flaccid], her muscles had absolutely no tone. So the—what would happen if the tube was pulled out is all of her tissues would have collapsed inward.

[STATE:] Did Woody O'Keefe's airway collapse?

[DEFENSE COUNSEL:] Objection, Judge. Can we approach the bench? I'd [like] to make a motion for mistrial at this time.

The judge then excused the jury from the courtroom and allowed the prosecutor to question Grotti about O'Keefe, a patient who allegedly died of acute morphine intoxication while under Grotti's care in April 2001. After the State had asked a few questions, the judge interrupted and asked, "Who is Woody O'Keefe?" With the judge's recommendation, the attorneys for both sides later agreed to excuse the jury for the remainder of the day. But before dismissing the jurors, the trial court instructed them as follows:

THE COURT: Now I will tell you this: Right before you went into the jury room, there was a question about referring to a Woody O'Keefe's airway. You will disregard for all purposes that question or any reference to a person named Woody O'Keefe, whoever that may be. Does everyone understand that instruction?

SEVERAL JURY MEMBERS: Yes.

THE COURT: All right. Disregard doesn't mean that you didn't hear it, you did. Disregard means that has nothing to do with anything going on in this trial. I won't even think about it or consider it for any purpose, whatsoever, just like I won't consider whether the Rangers won or lost last night because it has nothing to do with this trial. Does everyone understand what disregard means?

SEVERAL JURY MEMBERS: Yes.

THE COURT: Can everyone follow the Court's instruction to disregard that statement or remark?

SEVERAL JURY MEMBERS: Yes.

THE COURT: Is there anyone who cannot, if so, just raise your hands. I see no hands. I thank you for that and following the law and the rules and your instructions.

The trial court ultimately sustained Grotti's objection but denied her motion for mistrial.

■ The State initially argues that Grotti failed to preserve error because her attorney did not specifically object to the complained-of question. We disagree. After the trial court allowed the prosecutor to question Grotti about O'Keefe, it allowed Grotti's attorney to thoroughly explain the basis of the objection and argument. The basis of the objection is thus apparent from the record even though Grotti's counsel merely asserted a general objection when the prosecutor first asked the question.

Turning to the merits of Grotti's argument, the record does not demonstrate that the question posed by the prosecutor was "clearly prejudicial" to Grotti or was "so emotionally inflammatory" that the trial court's subsequent instruction to disregard failed to cure its prejudicial effect, if any. See Simpson, 119 S.W.3d at 272; Bauder, 921 S.W.2d at 698. Grotti did not have an opportunity to respond to the question, her counsel objected immediately, and no further questions concerning O'Keefe were asked in the presence of the jury. The trial court did not even know (or had to be reminded) who O'Keefe was. The severity of the conduct, if any, was thus minimal.

In addition to instructing the jury to disregard the question, the trial court gave the jury an opportunity to inform it if they could not follow the instruction; no one expressed an inability to follow the instruction. Grotti has presented no evidence to rebut the presumption that the jury followed the court's instruction to disregard. See Michaelwicz v. State, 186 S.W.3d 601, 620 (Tex.App.-Austin 2006, pet. ref'd) ("The jury is presumed to follow the trial court's instruction to disregard unless the comment is so prejudicial or extreme that the instruction was incapable of removing the harm."). We hold that the trial court's instruction to disregard was effective and cured the prejudicial effect, if any, stemming from the prosecutor's question. Accordingly, the trial court did not abuse its discretion by denying Grotti's motion for mistrial. We overrule Grotti's fifth issue.

## VI. EXPERT OPINIONS

■ In her sixth issue, Grotti argues that the opinions of the State's experts were based on conjecture, not fact. She argues that there is no evidence that from

20:50 to 21:50 McGhee had the spontaneous ability to maintain an adequate exchange of oxygen and carbon dioxide in her lungs and that there is no evidence that McGhee's heart was able to spontaneously circulate or perfuse oxygen-carrying blood to the organs of her body. She contends that, to the contrary, there was an abundance of evidence that McGhee lacked efficient spontaneous coronary perfusion and exchange of oxygen and carbon dioxide in her lungs. "For that reason," Grotti argues, "any opinion that Ms. McGhee was alive at 21:50 or that Dr. Grotti caused her death at 21:50 would have been the result of rank conjecture and speculation." Grotti's argument thus amounts to this: Because the evidence is insufficient to show that McGhee was alive at 21:50, Dr. Zimmerman's opinions regarding McGhee's condition at the same time were based on conjecture. We disagree.

A witness qualified as an expert may testify in the form of an opinion if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. TEX.R. EVID. 702. Expert witness testimony should be admitted only when it is helpful to the jury and limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror. *Williams v. State*, 895 S.W.2d 363, 366 (Tex.Crim.App.1994). An expert's opinion must be more than "subjective belief or unsupported speculation," but it need not reach the level of "known to a certainty" to be admissible. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue

to be decided by the trier of fact. TEX.R. EVID. 704.

The admissibility of evidence is within the discretion of the trial court, and the trial court's ruling will not be reversed absent an abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex.Crim.App. 2002). If there is evidence supporting the trial court's decision to admit evidence, there is no abuse of discretion. *Id.* at 538.

We initially note that although Grotti challenges the opinions of all of the experts who testified on behalf of the State, her brief addresses only the testimony of Dr. Zimmerman and not those of any other experts. Because she does not assert any argument or authority regarding the other State's experts, she has forfeited that portion of her argument by inadequate briefing. *See* TEX.R.APP. P. 38.1(h) (requiring brief to contain a clear and concise argument with appropriate citations); *Tong*, 25 S.W.3d at 710; *Jackson v. State*, 50 S.W.3d 579, 591 n. 1 (Tex.App.- Fort Worth 2001, pets. ref'd).

Grotti contends that Dr. Zimmerman's opinions were based on conjecture. However, Dr. Zimmerman testified that her opinions were based on McGhee's medical records, affidavits from JPS employees, letters and information from the Board, and her education, training, and expertise. Considering Dr. Zimmerman's stated basis for her opinion, other legally sufficient evidence corroborating Dr. Zimmerman's opinion, and Dr. Zimmerman's own specialized medical knowledge, Dr. Zimmerman's testimony was not based upon conjecture.

The factual background and sufficiency sections above demonstrate the complexity of the evidence involved in this case. An understanding of the relevant medical terms and concepts, such as agonal respiration, spinal reflex, metabolic acidosis,

ventricular fibrillation, ventricular tachycardia, and pulseless electrical activity, is beyond the common knowledge of the average juror. Dr. Zimmerman's testimony describing and explaining McGhee's condition during and after the code assisted the fact-finder in making its determination of the relevant issues. Grotti provides no authority supporting her argument that an expert's opinion is conjecture merely because there is an abundance of evidence to the contrary. Further, Dr. Zimmerman specifically identified the limitations of her opinion. That is, she conceded that she was "assuming" that McGhee was breathing, a key unknown fact. Thus, the jury was made aware of the assumption upon which her opinion was based. Accordingly, notwithstanding our factual sufficiency holding above, Dr. Zimmerman's conclusion that McGhee was alive at 21:50 was based on more than mere subjective belief or unsupported speculation. *See Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. The trial court did not abuse its discretion by admitting Dr. Zimmerman's testimony. Accordingly, we overrule Grotti's sixth issue.

## VII. DOUBLE JEOPARDY

■ In her seventh issue, Grotti argues that her prosecution violated the Fifth Amendment's prohibition against double jeopardy. The Board investigated the circumstances surrounding McGhee's death and ultimately ordered Grotti to pay an "administrative penalty" in the amount of $10,000 in addition to revoking her medical license and requiring her to reimburse the Board for costs incurred in preparation of the hearing transcript. Grotti contends that the administrative penalty implicates the constitutional protection against double

jeopardy because it is punitive in nature and not remedial, and therefore constitutes criminal "punishment" for double jeopardy purposes. Consequently, she argues that the State should have been barred from prosecuting her for murder because she had previously been subject to statutory "punishment" pursuant to the Texas Occupations Code. *See* TEX. OCC.CODE ANN. § 164.052 (Vernon Supp.2006), § 164.053 (Vernon 2004). The State responds that (1) application of the *Blockburger* test demonstrates that the offenses are not the same and (2) the $10,000 administrative penalty was not criminal "punishment."[23]

■ The double jeopardy clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense. U.S. CONST. amend. V. It bars three separate types of double jeopardy claims: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *Ex parte Herron,* 790 S.W.2d 623, 624 (Tex.Crim.App.1990) (op. on reh'g). These double jeopardy protections apply only when the duplicative prosecutions or punishments involve the "same offense." *Ex parte Broxton,* 888 S.W.2d 23, 25 (Tex.Crim.App.1994), *cert. denied,* 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). Grotti argues that her double jeopardy claim implicates the second and third categories.

■ Texas courts apply the same-elements test articulated by the United States Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180,

**23.** Grotti filed a pretrial motion to dismiss the indictment on the same grounds, which the trial court denied. She does not argue that her prosecution violates the double jeopardy provision found in article I, section 14 of the Texas Constitution. TEX. CONST. art. I, § 14.

76 L.Ed. 306 (1932), when reviewing a double jeopardy claim. *See Langs v. State*, 183 S.W.3d 680, 685 (Tex.Crim.App. 2006). This is achieved by examining the elements of the applicable statutes to determine whether each statute "requires proof of an additional fact which the other does not." *See Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182. If each statute requires proof of an additional fact that the other does not, then the two offenses are not the same offense for double jeopardy purposes. *Id.*

We begin by recognizing that legislative intent is the primary consideration in a multiple punishment double jeopardy claim and the "ultimate end that the 'same elements' test seeks." *Langs*, 183 S.W.3d at 685 n. 15, 688; *Saenz v. State*, 166 S.W.3d 270, 272 (Tex.Crim.App.2005) ("The Fifth Amendment's multiple punishments prohibition is violated when a defendant 'is convicted of more offenses than the legislature intended.'"). "The assumption underlying the rule is that [the legislature] ordinarily does not intend to punish the same offense under two different statutes." *Whalen v. United States*, 445 U.S. 684, 691–92, 100 S.Ct. 1432, 1437–38, 63 L.Ed.2d 715 (1980).

Here, disciplinary proceedings were initiated against Grotti pursuant to the Medical Practice Act ("MPA"). *See* TEX. OCC. CODE ANN. §§ 151.001–165.160 (Vernon 2004 & Supp.2006). The Board's order indicates that McGhee "committed" a "prohibited act or practice" pursuant to sections 164.052(a)(5) and 164.053(a)(1) of the MPA, which fall under the subtitle, "License Denial and Disciplinary Actions." *Id.* §§ 164.052(a)(5), 164.053(a)(1). Section 165.160, titled "Effect on Criminal Prosecution," states, "This subtitle does not bar a criminal prosecution for a violation of this subtitle or a rule adopted under this subtitle." *Id.* § 165.160. Thus, we initially note that the legislature clearly did not intend this administrative procedure to be a bar to criminal prosecution. Likewise, application of *Blockburger's* same-elements test further reveals that the legislature did not intend that the "offenses" be the same. Section 164.052(a)(5) provides that "[a] physician ... commits a prohibited practice if that person ... commits unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 164.053, or injure the public." *Id.* § 164.052(a)(5). The Board included the following in its conclusions of law:

> 3. Respondent [Grotti] committed a prohibited act or practice within the meaning of Section 164.052(a)(5) of the Act based upon unprofessional or dishonorable conduct that is likely to deceive or defraud the public or injure the public. Respondent's act of unprofessional conduct was her occlusion of [McGhee's] endotracheal tube.

Section 164.053(a)(1) provides that "[f]or purposes of Section 164.052(a)(5), unprofessional or dishonorable conduct likely to deceive or defraud the public includes conduct in which a physician ... commits an act that violates any state or federal law if the act is connected with the physician's practice of medicine." *Id.* § 164.053(a)(1). The Board included the following in its conclusions of law:

> 4. Respondent has committed a prohibited act or practice within the meaning of Section 164.053(a)(1) of the Act based on Respondent's commission of an act that violates any law of this state if the act is connected with Respondent's practice of medicine to wit: Respondent violated the Health and Safety Code Section 671.001 by failing to apply the statutory requirements for determining death with regard to [McGhee].

On the other hand, the indictment, which tracks the relevant penal code stat-

ute, charges Grotti with the offense of murder and states that "on or about December 26, 2000," Grotti "did then and there unlawfully, intentionally, and knowingly cause the death of [McGhee] ... by occluding the airway of [McGhee] with her finger ." It further provides that "on or about December 26, 2000," Grotti "did then and there unlawfully intend to cause serious bodily injury to [McGhee] ... and did cause the death of [McGhee] by intentionally and knowingly committing an act clearly dangerous to human life, namely occluding the airway of [McGhee] with her finger." [24]

The elements of the criminal offense and the prohibited acts under the MPA are different. A violation of section 164.052(a)(5) requires that a physician commit a prohibited practice. The murder offense is not limited to physicians. A section 164.052(a)(5) violation requires that the physician commit unprofessional or dishonorable conduct. The murder offense does not require this form of conduct. The same MPA-prohibited act requires that the conduct deceive or defraud the public. The murder offense does not require deception or fraud. A violation of section 164.053(a)(1) requires that the prohibited act be connected with the physician's practice of medicine. The murder offense does not require any connection with the practice of medicine. Further, the murder offense requires that the defendant intentionally or knowingly cause death or commit an act clearly dangerous to human life, but the MPA-prohibited acts contain no scienter requirement. Because

each "offense" requires proof of an additional fact that the other does not, the "offenses" are not the same. See Blockburger, 284 U.S. at 304, 52 S.Ct. at 182.

Grotti does not discuss whether the "prohibited act[s] or practice[s]" that she "committed" under the occupations code and the criminal offense that she was indicted for are the "same offense." As indicated above, Grotti's double jeopardy argument is based entirely on the theory that the $10,000 administrative penalty assessed against her constitutes criminal punishment, citing Hudson v. United States, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). Indeed, Hudson sets forth the proper inquiry for determining whether a civil penalty constitutes "punishment" for purposes of double jeopardy. See id. at 99, 118 S.Ct. at 493; see also Ex parte Ward, 964 S.W.2d 617, 620 (Tex. Crim.App.), cert. denied, 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998). This court and others, however, have recognized that the analysis of a multiple punishments claim—at least in terms of the situation in which the alleged criminal conduct violates two separate statutory provisions [25]—begins by determining whether the punishments are for the same offense. See Ex parte Tharp, 912 S.W.2d 887, 889 (Tex.App.-Fort Worth 1995), aff'd, 935 S.W.2d 157 (Tex.Crim.App.1996) ("Because the statutes describe the 'same offense' under the Blockburger test, if the driver's license suspension ... was punishment, then a subsequent prosecution for driving while intoxicated will be barred by double

24. We compare the offense charged, murder, as opposed to the offense that Grotti was convicted of, criminally negligent homicide, because Grotti sought to dismiss the indictment pretrial on double jeopardy grounds. Moreover, as we indicate below, Grotti does not conduct a same-elements examination in her brief. The State, however, does, arguing

that a comparison of the elements of the offenses considered in the administrative proceeding with the elements of the offense contained in the indictment shows that Grotti has not been subjected to double jeopardy.

25. See Vineyard v. State, 958 S.W.2d 834, 836 n. 5 (Tex.Crim.App.1998).

jeopardy."); *see also Langs,* 183 S.W.3d at 685 ("This Court adopted the *Blockburger* test long ago, and we continue to apply it as the first means of analyzing a multiple-punishment double-jeopardy claim when the legislature's intent is not clearly expressed."); *Johnson v. State,* 920 S.W.2d 692, 693–94 (Tex.App.-Houston [1st Dist.] 1996, pet. ref'd) (applying *Blockburger* test to appellant's criminal "punishment" argument). Because the criminal offense and MPA-prohibited acts are not the same offenses for double jeopardy purposes, we need not determine whether the "administrative penalty" levied against Grotti constitutes criminal "punishment." *See Ex parte Mitchell,* No. 05–01–00213–CR, 2001 WL 579931, at *2 (Tex.App.-Dallas May 31, 2001, no pet.) (not designated for publication) (denying appellant's application for pretrial writ of habeas corpus because elements of criminal offense and administrative offense different). Accordingly, Grotti's subsequent murder prosecution did not violate the Fifth Amendment's prohibition against double jeopardy. We overrule Grotti's seventh issue.

## VIII. CONCLUSION

Having sustained Grotti's first issue, we reverse the trial court's judgment and remand this case for a new trial. *See Watson,* 204 S.W.3d at 412–414; *Clewis v. State,* 922 S.W.2d 126, 133–34 (Tex.Crim. App.1996).