COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                        NO.
2-08-263-CR

 

 

LINDA CUVILLIER                                                                APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 371ST
DISTRICT COURT OF TARRANT
 COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                            Introduction

Linda Cuvillier brings eight points in her appeal
of her conviction and twenty-year sentence for aggravated assault of a family
member, her great-aunt Irene Garrett. 
She challenges (1) the legal and factual sufficiency of the evidence to
prove that she was the perpetrator, (2) the admission of Irene=s
medical records, testimony from a paramedic regarding statements Irene made
during treatment, and testimony regarding an extraneous offense, and (3) the
trial court=s failure to give requested
limiting instructions.  We affirm.

Legal and Factual Sufficiency of the Evidence

In her first and second points, appellant
challenges the legal and factual sufficiency of the evidence to prove that she
was the person who committed the offense.

Standards of Review

In reviewing the legal sufficiency of the
evidence to support a conviction, we view all of the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct.
2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Neal v.
State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), cert. denied, 129
S. Ct. 1037 (2009); Watson v. State,
204 S.W.3d 404, 414 (Tex. Crim. App. 2006). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Lancon v. State, 253
S.W.3d 699, 704 (Tex.
Crim. App. 2008); Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.

Applicable Facts

Irene was eighty-four at the time of trial and a
widow.  She testified that she used to
live alone in a house on Northwest
 23rd Street in Fort Worth, and appellant would occasionally
visit her.  One evening, in May 2007,
appellant came over, and Irene let her inside. 
After appellant came inside, she hit Irene over the head with a baseball
bat[2]
and said, AShut up.@  Irene thinks she was knocked
unconscious.  She did not know how many
times she was hit, but she did get a broken arm, jaw, and nose.  As a result of her injuries, she was still
using a walker at the time of trial and had trouble hearing out of her left
ear.[3]  She also had dizzy spells Aall the
time@ that
she had not had before.

The following exchange occurred on
cross-examination:








[Defense]:  Okay.  Where in the house were you when [appellant]
came over?

 

[Irene]:       I was in the bed.

[Defense]:  Is that where you were when she hit you?

[Irene]:       Yeah, on the back
room.  They said they found me in the
back room.

 

[Defense]:  They said? 
Who=s they?

[Irene]:       Well, it=s where the . . . police
found me, and the      ambulance took me
to the hospital, and she was . . . chasing her boyfriend with a butcher knife,
and he - -

 

[Defense]:  Let me - - you were unconscious, though,
right?       So
who told you the story?

 

[Irene]:       Well, anyway, he told . . . the cop that - - 

[Defense]:  Ms. Garrett, let me stop you for just one
second.      Okay, ma=am?  You said you were unconscious, right?

 

[Irene]:       Yeah.

[Defense]:  Okay.  Who told you the story you=re telling me now?

 

[Irene]:       It was after . . .
I was conscious and in the hospital. 
They said - - the cop - - they told the cop, AThere=s a lady down there on Northwest 23rd Street
in a pool of blood.  I don=t know if she=s dead or alive.@  And the cops come and found me, and then the
ambulance took me to the hospital.

 

[Defense]:  Okay. 
But those aren=t your memories, are they?

[Irene]:       No.

[Defense]:  That=s what
other people told you afterwards?

[Irene]:       Yeah.

. . . .

[Defense]:  And you remember seeing [appellant]?

[Irene]:       Yeah.

[Emphasis added.]

When shown a photograph of her front door and asked if it looked as if
it were broken around the door handle, Irene answered, ANo, not
really.@  She was also shown a picture of a gun on a
table inside her house; she answered that it was not her gun.  When asked if she knew anyone who did have a
gun, Irene answered, AShe did.@  But it is unclear who Ashe@ refers
to.

Through Judy Thomas, a custodian of medical
records at JPS Health Network, the State introduced, and the trial court
admitted, the medical records from Irene=s
admission to John
 Peter Smith
 Hospital.  The records contain several notations indicating
that Irene=s niece hit her with a baseball
bat.

Bobby Mills, the brother of appellant=s friend
Jerald Mills, testified that on May 22, 2007, he let Jerald drive his car.  When he needed it back after work that night,
his father drove him to appellant and Jerald=s house
to pick it up.  Around 6:00 or 7:00 that
evening, Bobby drove appellant in his car[4]
to her AAunt
Irene=s@ house
on 23rd Street
.  When they arrived at the house, appellant=s broken
down, red Mustang was in the driveway. 
Bobby waited while appellant went inside; she knocked on the door and
then went inside when no one answered. 
When she came out, she was holding a baseball bat.  When she got to Bobby=s car,
she leaned on the bat and then told Bobby Ashe
messed up@ and that Ashe
thought someone broke in the house@ and Abeat her
brain.@  Although appellant tried to get into the car
with the bat, Bobby left and went to get Jerald.

Jerald did not believe Bobby when he told him
what appellant had said, so, at Jerald=s
direction, Bobby went back to Irene=s house
alone.  When he arrived, appellant did
not have the bat with her.  She would not
get in the car with Bobby, so he left and went back to get Jerald.  When Bobby and Jerald arrived at Irene=s house,
appellant tried to put the bat and a Abig old
stuffed doll@ in his car.[5]  Bobby did not want her to put those things in
his car, so at Jerald=s urging, he left appellant and
Jerald at Irene=s house and went home.  Before Jerald told him to leave, however, he
saw Jerald make a call on his cell phone; Jerald told Bobby he was calling
911.  Bobby never saw anyone other than
appellant come out of Irene=s house,
and he never saw Jerald go inside.  Both
the State and appellant asked Bobby questions about his prior convictions for
DWI and misdemeanor theft and assault.

Immediately upon calling Jerald to the stand, the
State questioned him about his prior aggravated assault and misdemeanor assault
convictions.  Jerald admitted that he had
been convicted of these offenses but no others. 
Jerald then testified that on May 22, 2007, he and appellant were at her
house, and he was working on a truck for her. 
He did not have a working vehicle, so he borrowed Bobby=s car to
run some errands during the day. 
Appellant asked him to get drugs for her too, but he did not help her
get any.  Jerald testified that he picked
Bobby up from Bobby=s boss=s house
that night and took him back to appellant=s
house.  According to Jerald, Bobby and
appellant then left together.








Jerald said that appellant asked Bobby to drive
her to buy drugs, and Jerald told Bobby not to take her.  After arguing about it for awhile, though, he
finally told Bobby to take appellant but to come back if she could not find any
drugs.  But Bobby came back alone within Aa couple
of minutes.@ 
Bobby told Jerald why he came back, and Jerald told him to go back and
get appellant.  When Bobby came back
alone a second time, Jerald got in the car and went with him to AAunt
Irene=s@ house
on 23rd Street
.

According to Jerald, when he and Bobby arrived at
the house, appellant was out front with Alike a
green thing and a bat.@[6]  She wanted to put the bat in Bobby=s car,
but Jerald Adidn=t feel
good about that.@ 
He told her to take the bat and leave; he then pretended to call the
police and told Bobby to leave.  However,
appellant would not leave.  Jerald left
and walked back to appellant=s
house.  He was there alone for between
four and six hours.

At some point, Jerald decided to go buy some
cigarettes; on the way to the store, he went out of his way to pass by Irene=s house,
and he noticed a light on.  He had been
worrying about whether appellant actually did what she told Bobby she did.  After he got his cigarettes, he went back by
Irene=s house;
appellant=s red Mustang was in the
driveway.  A light was on, which he
thought was unusual at that time of night. 
As he was walking by the house, he heard someone call his name, and when
he walked over, it was appellant.  She
was standing in front of the red Mustang. 
Jerald asked appellant what was going on; according to Jerald,

I kept asking her and asking her, and she had like this doll thing,[[7]]
and she threw it down on the ground and like stuck its hands behind its back,
and I kept asking her what=s going on, and she just kept giving these weird
looks like I don=t know.  I kept asking her, and she goes, AYou open the door and
look.@  And I said, AI=m not going to open the
door.  You open the door.@  So we both walked up there.  She opened the door.  I looked to the left and I seen Aunt Irene
there.

 

Jerald said that because Irene=s house
was small, he only had to walk in a couple of steps before he was able to see
her.  Irene=s eyes
were Aall
bloody and her head, and she had like cover on her from here down, and she just
kept asking for a drink of water.@  Jerald felt sick when he saw her.

After Jerald left the house, he fainted.  When he came to, appellant was standing over
him, telling him he had better get up, which terrified him.  He ran back to appellant=s house,
packed a duffel bag, and started walking back to Irene=s
house.  On direct he testified that at
some point he became afraid for himself and called 911 Ato turn
[appellant] in and tell the police what happened.@  It was after midnight on May 23 when he
finally called 911.

The State played the 911 call for the jury.  On it, Jerald is excited, eventually becoming
hysterical and crying.  He told the 911
operator that appellant was chasing him, and she had a knife Aor
somethin=.@  He also said appellant had Abeat up@ her
aunt with a baseball bat and that she was on drugs Areal
bad.@

On cross-examination, Jerald explained that when
he neared Irene=s house, he heard something Alike a
foot scrapes on the ground@; the
sound turned out to be appellant.  Jerald
said in his 911 call that appellant was chasing him with a knife; he admitted
he had since said he did not actually see a knife, but testified that A[t]here
was something . . . [that] looked like a knife.@  He also testified that appellant chased him
down the street but then hid around a house on 22nd Street
.

Jerald denied giving appellant any medication on
May 22, 2007.  He was firm in contending
that Bobby was gone for only about two minutes before he came back telling
Jerald that appellant told him she had messed up and beaten someone to
death.  After being shown photographs of
appellant taken that night, Jerald agreed appellant had cuts on her arms and
hands, but he denied knowing how those cuts got there.  According to Jerald, the cuts were on
appellant=s arms when he was over at her
house during the day.  He denied having a
cut on himself that night and also denied that a spot on the sole of his shoes
was blood.  He denied trying to make
appellant get in the car with him and Bobby.








On May 23, 2007, around 1:00 a.m., Fort Worth
Police Department Officers Roger Ballard and Ann Hall responded to the area
around Irene=s home based on a 911 report of
a person with a weapon.  Officer Ballard
testified that when they arrived at a nearby business, they found Jerald Mills,
holding Asome
sort of a bag@ and a fishing pole and standing
in the middle of the intersection waving his arms.  He was Ahysterical@; his
voice was high-pitched, he was yelling, and he was scared.  Jerald did not appear to be injured, but his Amain
concern@ was
that his girlfriend, later identified as appellant, had a knife and was chasing
him.  Officer Ballard did not think
Jerald was under the influence of any substances.

Jerald directed the officers to a house one block
away from Irene=s; the officers found appellant
walking from that house towards the street. 
She was calm but appeared to Officer Ballard to be AJonesing.@  After the officers detained her and placed
the two in separate cars, Jerald Astarted
yelling@ at
Officer Ballard to check on appellant=s AAunt
Irene.@  He told Officer Ballard that appellant had Abeaten
[Irene] to death with a baseball bat.@  Jerald then directed Officer Ballard to Irene=s house.

When Officer Ballard arrived at the house, the
front door was open.  He knocked,
identified himself as a Fort Worth
police officer, and stepped inside after he did not receive a response.  In a bedroom, which was not far inside the
house and to the left of the front door, he found Irene Alying on
the bed in a large puddle of blood.@  He did not notice any injuries other than to
her head.  Based on her appearance,
though, he thought she was dead.

On cross-examination, Officer Ballard admitted
that the officers searched the area that night but never found a knife or the
bat.  He went to Irene=s house
later with a crime scene officer; the only place he saw blood was in the
bedroom and on the doorway between the bedroom and bathroom.  He did not think the front door looked like
it had been broken into.  Officer Ballard
did not notice any blood on Jerald or appellant, but he also said he did not Aexamine@ either
one of them.  He also never saw a gun in
the house.

Officer Hall testified that she pat down
appellant after she emerged from the side of the house where Jerald told the
officers she was hiding, but Officer Hall did not find any weapon on
appellant.  Appellant was coherent and
able to follow instructions.  Officer
Hall did not notice any cuts or injuries on appellant or Jerald.  Appellant was excited, but not as excited as
Jerald, and neither of them appeared to be under the influence of any
substances.

Paramedic John Mark Garner testified that he
responded to a call at 2719
 Northwest 23rd Street around 1:00 a.m. on May 23,
2007.  The only people he saw at the
house were police officers and firefighters. 
When he first walked in, he was in a small living room; the officers
then directed him and his partner to a small side room where Irene was on the
bed.  Her head was in a pool of partially
clotted blood at the head of the bed. 
Irene was conscious and alert, but her face was very bloody and swollen;
some of the blood had clotted.  She was
very scared, and she could not see because her eyes were completely closed; the
paramedics had to pry them open.

Irene complained about pain in her head, abdomen,
left arm, back, neck, and face.  She did
not have any injury indicating that she might have been restrained.  To evaluate Irene=s
potential for a head injury, Garner asked her what happened.  She told him that her niece, appellant, Ahad done
this with a baseball bat.@

On cross-examination, Garner admitted that
sometimes older people can have trouble with questions after trauma due to
hearing loss or some other factor such as Alzheimer=s.  But he contended that if an elderly patient
gave a seemingly incorrect answer to a question, he would repeat the question
to make sure he or she understood.  He
explained that if a person can identify his or her attacker, it shows a Avery
high functioning level of their cognitive function.@  He admitted that he would have no way of
knowing whether that person=s answer
was truthful without any corroborating information.  He also admitted that blood loss could cause
a loss of cognitive function but that its effects differ from person to
person.  He explained that Irene was Acompletely
alert and oriented . . . [, and] very cognizant and coherent,@ but
that she could have forgotten speaking to him if she had a slow brain bleed
instead of a fast one.

Garner told the defense that Irene=s
injuries were disturbing to him because of her age and because she had numerous
injuries; he described it as having been Aclobbered.@  In his opinion, her injuries were consistent
with having been hit multiple times with a baseball bat.

Detective James Varnon of the Fort Worth Police
Department testified that he did the crime scene investigation in the case; he
arrived at Irene=s house around 2:00 a.m. on May
23.  He collected a glass with blood on
it from the bed, a ball cap lying in the driveway outside, and a life-sized
cloth doll from the bedroom.  Although he
looked around the perimeter of the house that night, he did not find anything
of significance.  He did not find any
evidence of forced entry into the home. 
He did, however, take photographs of appellant and Jerald.  According to Detective Varnon, if he had seen
blood on anyone=s clothes or shoes, he would
have collected those items.  Most of the
blood was on the bed and the floor beside the bed; there was no blood trail
leading to any other rooms.  He did not
find either a baseball bat or a knife.

On cross-examination, Detective Varnon admitted
he examined appellant and Jerald in the dark with a flashlight and possibly
could have missed spots of blood on their clothes or shoes.  He never saw a duffel bag with Jerald; if he
had, he would have thought it was important enough to be searched.  Detective Varnon said that a blood spatter on
the wall could have indicated multiple possibilities:  Irene was hit in the hallway, she was hit
lying down or she was bleeding while close to the floor, she was hit and then
fell to her knees and was hit again, or she Ahuffed@ blood
from her face and nose onto the wall.

Detective Varnon testified that he did not
collect a rope of indeterminate material hanging on the bed frame as a result
of a conversation between him and Officer Ballard; he could not explain why it
was there, and admitted it could have been used as a restraint.  He did opine that a gun on one of the tables,
which was shown in photographs of Irene=s house,
was a toy because it had a yellow plastic piece over the muzzle.  Also, Detective Varnon believed that the
scrapes on the door were old and that if a break-in had been attempted, it did
not happen recently.  He opined that the scrapes
on appellant=s arms had occurred within a few
hours.  He did not find a knife.  The doll he collected was clean and did not
appear to have any stab marks on it.

Detective Kimberly Stamp was assigned to
investigate Irene=s assault.  She initially went to JPS to interview Irene,
but Irene had been sedated and was unable to speak.  Instead, Detective Stamp spoke with Irene=s daughter
Dorothy Estep.  From talking to Estep,
she received information that the police needed to retrieve a baseball bat at
Irene=s
house.  She and Sergeant Brandon Johnson
then went to Irene=s house to get the bat; when
they found it, there was a board over it.

When Detective Stamp was able to interview Irene,
Irene=s
daughter Barbara had to repeat the questions to Irene, who answered only yes or
no.  But according to Detective Stamp,
Barbara repeated the questions exactly as Detective Stamp asked them.  Detective Stamp collected a DNA sample from
Irene, which the crime lab tested against blood samples taken from the bat.[8]

On cross, Detective Stamp admitted that no one
ever found a knife and that no samples had been taken from the part of the bat
where someone would hold it.  No one
collected the rope-like pieces hanging from the bed, and no one tested the
glass that was found.  Detective Stamp
never went inside the house.  She
interviewed both Jerald and Bobby but only for about 12-15 minutes or less.[9]

Detective Stamp did not know if anyone searched
the duffel bag Jerald had.  She recalled
Bobby telling her that appellant knocked on the front door of Irene=s house
then went around to the side and that he thought she went in the house through
a window.

Detective Stamp agreed that when she asked Irene
if a man had been in the house that night, she said, Ayes.@  But she also responded, when asked who Adid this@ to her,
AMy
sister=s
daughter, Loretta.@[10]

Sergeant Johnson testified that on May 24 or 25,
2007, the day after Irene was assaulted, he went to her former home with
Detective Kimberly Stamp to look for the baseball bat.  The detectives found the bat in the front
yard to the left of the driveway underneath some bushes.  They also found a two by four, which was
either lying next to or on top of the bat. 
The crime scene had not been secured the night before.

Irene=s
daughter Dorothy testified that she and her husband found the bat at Irene=s house
on the evening of May 23 and immediately called Detective Stamp.  They did not touch the bat or move it.  According to Dorothy, her mother was a
gardener and had a Apretty lush front yard.@








After speaking to her mother at the hospital,
Dorothy spoke with Detective Stamp.  Her
mother=s
condition was so serious that the hospital put her into a semicoma in ICU.  She could not breathe without the assistance
of a respirator,[11]
and she needed a blood transfusion. 
Because Irene had a living will, the family decided to have the
respirator turned off, expecting her to die. 
Although Irene was able to live without life support, she remained at
JPS for Aquite
some time@ and was released to physical
therapy to learn how to walk and sit up. 
She could no longer live independently as she had before the assault,
and she had hearing loss.

George Garrett testified that he knew Irene
because she had been married to his cousin. 
George had lived with Irene off and on in 2007 and helped her around the
house.  George had given the bat to Irene
to protect herself with; she kept it by the front door.  When George lived with Irene, he lived in a
room at the back of the house with a back door leading into it.  According to George, Irene kept a two by
four, similar to the one the police found in the front yard, across the door to
make sure no one could get in.

George got a job in Springtown starting May 23,
so he had his cousin pick him up the day before and take him there.[12]  He stayed in Springtown overnight.  He became worried when he tried to call Irene
and she did not answer, so he called his friend Roy Dennis to check on
her.  Roy picked George up at the Dairy Queen after
George got a ride there and took him to Irene=s house
and eventually to the hospital to see Irene. 
He thought he had been in Springtown only one day.

Roy Dennis testified that George told him that he
had been working in Springtown on May 23, 2007. 
When Roy
first went to Irene=s house, she was not there.  He saw two police officers on mounted patrol
and told them why he was there; they looked around the yard and the house and
then called more officers to the house, who opened the door.  Roy
saw signs of blood and called George to tell him to come home.  Roy and his girlfriend drove to meet George
halfway; Roy
knew George had been working because he was dirty.  Roy then got George cleaned up and took him
to JPS to see Irene.

Michael Riley testified for the defense.  He lived on the corner of 23rd Street and Kearney, two houses north of Irene=s and
close enough to see her house from his backyard.  About 10:45 or 11:15 p.m. on May 22, he let
his dogs out into the backyard and heard a Aruckus.@  He went around to the front and saw a white
car heading toward Kearney
on 23rd; there were one or perhaps two people in the car.  Although he said it was Avery
dark@ and Avery
late,@[13] he also
stated unequivocally that whoever was in the car was male, and he could see a
light inside, like a cell phone being activated.  He could also see a white female walking up
the street A[t]rying to get away from the
white car.@ 
According to Riley, there was shouting going on, as if the people were
quarreling, but he could not recall the exact words that were being said.  He thought it looked like a Alover=s
quarrel.@  The woman appeared to be running away from
the man in the car, and she seemed upset. 
He saw an ambulance at Irene=s Aa few
minutes after that.@

On cross, Riley admitted that the event had
occurred in the springtime, but he did not remember the exact date.  He also admitted there is a lot of car and
foot traffic in the neighborhood.  The
car looked like a late 80s model Oldsmobile, Chevrolet, or Chrysler.[14]

Appellant testified that she was very close to
Irene.  She denied hitting her.  According to appellant, on May 22, 2007, she
was in the middle of moving, and Jerald was staying at her house for a few days.[15]  She did not go anywhere that morning because
she had a severe headache.  Jerald went
out and brought back $30 and two pills, which she thought were Tylenol.  Around 1:00 or 2:00 p.m., her son came over
and brought some meat to barbecue; about twenty or thirty minutes later, she
lay down and passed out on her bed.

Appellant testified that she woke up about three
or four hours later.  She tried to help
Jerald with the truck, but she was too tired, and she fell asleep again around
5:00 or 6:00 p.m.  According to
appellant, Jerald left the house when it was almost dark, and she Apassed
out again.@ 
She woke up when it was Apretty
late@ and
left the house to go to a convenience store. 
On her way back, she got a ride from a man she had known Afor
quite some time.@[16]

The man took her home, and she went inside and
left the Coke and cigarettes she had bought. 
She then got back in the car and went riding around for about twenty
minutes until the man dropped her off at Irene=s
house.  According to appellant, she
usually spent the night at Irene=s house
because she was scared to stay at her own home.

Appellant said that when the man dropped her off
at Irene=s, she
saw a white car[17]
there and was kind of scared but got out of the car anyway.  After she got out, she saw Jerald coming out
from in front of her car that had been parked in the driveway; he was Aacting
real angry, and then he would start crying and screaming, crying, and then he
would act angry.@ 
Appellant left and went up the street.

Appellant testified that, with Jerald following
her in the white car, she ran around the corner to a house where she had seen a
man pull into the driveway.  She had to
run through some bushes to get to the house. 
She knocked on the door, but the man did not answer, so she went around
to the back, but the man had already gone inside.  According to appellant, she then went back
around to the front and saw Jerald; he had duffel bags and was Awhapping@ a
fishing rod at the street and her, hitting her a couple of times.  He said he was calling the police.  She tried to get away from Jerald for about
twenty minutes.

Appellant testified that Jerald had hit her
before.

According to appellant, she stayed in a driveway
by a house on 22nd Street
until the police came, at which point she came out to meet them.  They handcuffed her immediately.

On cross, appellant admitted that Bobby came over
to her house, but she denied going to Irene=s house
with him.  She did not try to go into
Irene=s house
to escape Jerald because the light was out, and she thought Irene had gone
somewhere else to spend the night.

AnalysisCLegal Sufficiency

Appellant=s legal
sufficiency point merely summarizes the evidence without providing argument as
to why the evidence is legally insufficient. 
In her recitation of the facts, however, she does point to (1) the fact
that the police did not investigate any persons other than appellant and did
not test some of the items they found at the scene for fingerprints or DNA, (2)
alleged inconsistencies in Irene=s
medical records, (3) the fact that the police never found a knife or any other
weapon to corroborate Jerald=s testimony
and never checked the duffel bag or bags he was carrying, (4) the fact that
both appellant and Jerald had scratches on their hands that night, and (5) the
lack of security around the crime scene before the officers retrieved the bat.

Appellant=s
argument, then, appears to focus on what was not in evidence rather than
the evidence that was actually admitted at trial, which is what we must rely
upon in performing both a legal and factual sufficiency review.  Here, the jury was entitled to believe Irene=s
unequivocal testimony that appellant hit her with a baseball bat, causing her
injuries, and to disbelieve appellant=s
testimony; moreover, we must defer to the jury=s
resolution of any conflicts in the testimony. 
See Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Schmidt
v. State, 232 S.W.3d 66, 68 (Tex.
Crim. App. 2007).  We hold that the
evidence is legally sufficient to support the jury=s
determination that appellant committed the offense.  We overrule appellant=s first
point.

AnalysisCFactual Sufficiency

In her second point, appellant argues that








[c]onfusion about the mysterious knife goes to Jerald Mills[>s] credibility.  Police officers left many things undone
because they had a suspect, even though the person who initially pointed the
finger at [a]ppellant turned out to be less than credible.  The crime scene was left unsecured for hours
or days, depending on the particular witness testifying, and the most damning
piece of evidence against [a]ppellant is miraculously found later by civilian
witnesses.  There was DNA testing that
wasn=t done, not because it
wasn=t feasible, but simply
because the police didn=t bother to request it.

 

Thus, appellant argues, the evidence was so weak that her conviction
was clearly wrong and manifestly unjust, or, alternatively, that it was against
the great weight of the evidence.

Even viewing the evidence in a neutral light,
Irene=s
testimony is sufficient to prove appellant=s
identity as her assailant; thus, the evidence is not too weak to support the
verdict even under a factual sufficiency standard of review.  Although appellant claims Irene=s
testimony was confusing as to whether she was only stating what other people
told her, it is clear that her references to other people telling her stories
were related to after appellant hit her and she lost consciousness
(i.e., stories about the police finding her and appellant=s
chasing Jerald with a knife).  Her
testimony about what happened before the attack was clear and unequivocal.

Likewise, the lack of any further police
investigation is not as significant here in light of Irene=s
unequivocal and unwavering identification of appellant as her attacker and in
light of the fact that the investigation that was done corroborated Irene=s
story.  And although there are
inconsistencies between Jerald=s and
Bobby=s
versions of eventsCand defense witness Michael
Riley=sCthose
inconsistencies are not so compelling as to outweigh Irene=s
testimony and the other evidence supporting the verdict.  We conclude that although there is some
evidence contrary to the jury=s
verdict, it is not so great as to render the verdict factually
insufficient.  See Lancon, 253 S.W.3d
at 704; Watson, 204 S.W.3d at 414B15,
417.  We overrule appellant=s second
point.

Irene=s
Medical Records

In her third through fifth points, appellant
contends that the trial court abused its discretion by admitting all of Irene=s
medical records related to her treatment for the assault because they were
substantially more prejudicial than probative, because they violated appellant=s Sixth
Amendment Confrontation Clause rights, and because they contain inadmissible
hearsay statements indicating that Irene=s niece
was the attacker.  In her seventh point,
appellant contends the trial court erred by failing to grant her request for a
midtrial limiting instruction restricting the jury from considering the records
for any purpose other than the fact that Irene was admitted on the dates listed
in the records.

Admissibility under Rule
403

At trial, appellant argued that
in light of Irene=s testimony that appellant was
the person who hit her with the bat, admission of the records containing
references to Irene=s niece hitting her with a bat
was repetitive, confusing, and served only to bolster Irene=s
testimony by lending the credibility of the medical professionals whose notes
were memorialized in the records.  But
although appellant brings a point on 403 grounds, and cites rule 403, there is
no argument in the brief addressing the rule 403 arguments made at trial.  Thus, this point is either inadequately
briefed or fails to conform to the objection made at trial.  See Tex. R. App. P. 33.1(a)(1),
38.1(i); Grotti v. State, 209 S.W.3d 747, 778 (Tex. App.CFort
Worth 2006), aff=d, 273
S.W.3d 273 (Tex. Crim. App. 2008); Heidelberg v. State, 144 S.W.3d 535,
537 (Tex. Crim. App. 2004).  We overrule
appellant=s third point.

Confrontation Clause

Appellant also contends that the admission of the
records violated her Sixth Amendment Confrontation Clause rights.  But appellant never objected to the admission
of the records on that basis at trial. 
Although she pointed the trial court to the De la Paz case from
the Eastland Court of Appeals, which addressed a Confrontation Clause
complaint, her counsel=s comments to the trial court
clearly show that her objections were based on the hearsay complaint and
analysis in that case.[18]  See De la Paz v. State, 229 S.W.3d
795,  798B99 (Tex.
App.CEastland
2007), rev=d, 273
S.W.3d 671 (Tex. Crim. App. 2008).  Thus,
she did not preserve error on this issue. 
See Tex. R. App. P. 33.1(a)(1); Wright v. State, 28 S.W.3d
526, 536 (Tex. Crim. App. 2000), cert. denied, 531 U.S. 1128
(2001); Courson v. State, 160 S.W.3d 125, 129 (Tex. App.CFort
Worth 2005, no pet.).  We overrule
appellant=s fifth point.

Hearsay Complaint

Appellant=s
hearsay complaint likewise fails because Irene=s
unobjected-to identification of appellant as her attacker renders the admission
of the records harmless.  Appellant=s only
timely complaint at trial was about the statements contained within the records
identifying Irene=s Aniece@ as her
attacker; at that time, she specifically asked for redaction of only those
parts of the statements.  However,
because those identifying statements are cumulative of unobjected-to evidence
admitted before the records, there is no reversible error.  See Tex. R. App. P. 44.2(b); Leday
v. State, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (AIt is
well established that the improper admission of evidence does not constitute
reversible error if the same facts are shown by other evidence which is not
challenged.@ (quoting Crocker v. State,
573 S.W.2d 190, 201 (Tex. Crim. App. 1978))). 
Thus, we overrule appellant=s fourth
point.

Limiting Instruction

Further, appellant did not request a limiting
instruction when the medical records were first admitted for all purposes.  Thus, she failed to preserve this point for
review.  See Tex.
R. App. P. 33.1(a)(1); Hammock v. State, 46 S.W.3d 889, 895 (Tex. Crim. App.
2001).  Moreover, when the records were
first admitted at trial, she made clear that her hearsay objection was directed
only to the Awho@ part of
the recordsCi.e., the statements attributed
to Irene that appellant hit her with a baseball batCrather
than the Awhat@ parts,
which is what her proposed limiting instruction addressed.  Thus, her untimely request for a limiting
instruction after the records had been admitted for all purposes did not
comport with her timely objections.  We
overrule her seventh point.

Admissibility of Paramedic=s
Testimony

In her sixth point, appellant contends the trial
court abused its discretion by admitting paramedic Garner=s
testimony that Irene told him appellant had assaulted her because it is inadmissible
hearsay not subject to an exception.  The
State responds that the evidence is admissible under several hearsay
exceptions, including the excited utterance exception.

An Aexcited
utterance@ is A[a]
statement relating to a startling event or condition made while the declarant
was under the stress of excitement caused by the event or condition.@  Tex.
R. Evid. 803(2); Davis v. State, 268 S.W.3d 683, 703 (Tex. App.CFort
Worth 2008, pet. ref=d).  In determining whether a hearsay statement is
admissible as an excited utterance, a court may consider the time elapsed and
whether the statement was in response to a question.  Zuliani v. State, 97 S.W.3d 589, 595
(Tex. Crim. App. 2003); Salazar v. State, 38 S.W.3d 141, 154 (Tex. Crim.
App.), cert. denied, 534 U.S. 855 (2001); Davis, 268 S.W.3d at 703.  However, it is not dispositive that the
statement is an answer to a question or that it was separated by a period of
time from the startling event; these are simply factors to consider in determining
whether the statement is admissible under the excited utterance hearsay
exception.  Zuliani, 97 S.W.3d at
596; Davis, 268 S.W.3d at 703.

The critical determination is Awhether
the declarant was still dominated by the emotions, excitement, fear, or
pain of the event@ at the time of the
statement.  Zuliani, 97 S.W.3d at
596 (emphasis added); Davis,
268 S.W.3d at 703.  Stated differently, a
reviewing court must determine whether the statement was made Aunder
such circumstances as would reasonably show that it resulted from impulse
rather than reason and reflection.@  Zuliani, 97 S.W.3d at 596; Davis,
268 S.W.3d at 703.

Although Garner described Irene as conscious and
alert, he also said that she was Avery
scared@ and in
pain.  Her face was covered in blood to
the point that Garner could not tell where her nose and mouth were except when
she spoke.  Her eyes were swollen shut,
and she could not see the emergency personnel around her; they had to pry open
her eyes.  AlthoughCif the
events occurred according to Bobby=s
testimonyCIrene would have been lying in
her bed around six to seven hours before Garner spoke with her, she testified
that she had been knocked unconscious for at least part of that time.  Even if she were awake for much of that time,
she would have been lying there in pain and in her own blood.  Based on these facts, we cannot say that the
trial court acted outside the zone of reasonable disagreement by overruling
appellant=s hearsay objection to Garner=s
testimony and admitting it as an excited utterance.  See, e.g., Zuliani, 97 S.W.3d
at 596; Davis,
268 S.W.3d at 703; Lagunas v. State, 187 S.W.3d 503, 513 (Tex. App.CAustin
2005, pet. ref=d).[19]  We overrule appellant=s sixth
point.

Extraneous Offense of Chasing Jerald With a Knife

In her eighth point, appellant claims that the
trial court erred by failing to give a limiting instruction in the jury charge
as to the extraneous offense of appellant=s
chasing Jerald with a knife.  According
to appellant, the trial court should have sua sponte instructed the jury on the
limited uses of extraneous offenses and that extraneous offenses must be proven
beyond a reasonable doubt.  However,
absent a request by appellant for a limiting instruction either at the time the
evidence was admitted or when the charge was being prepared, the trial court
was not required to provide such an instruction.  See Delgado v. State, 235 S.W.3d 244,
254 (Tex.
Crim. App. 2007).  Accordingly, we
overrule appellant=s eighth point.

Conclusion

Having overruled appellant=s eight
points, we affirm the trial court=s
judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  October 22, 2009











[1]See Tex. R. App. P. 47.4.





[2]Irene testified that she
kept a bat in her house that her cousin had given her for protection.





[3]It is clear from the
record that Irene still had a hard time hearing, especially when the defense
cross-examined her.





[4]According to Bobby, he Ascrapped@ the car about a month
later.





[5]Irene had testified that
she had a large, almost adult-sized doll in her bedroom, which her daughter had
made.





[6]He later described the Agreen thing@ as having tools in it.





[7]Jerald explained that the
doll was adult-sized.





[8]An analyst for the Fort Worth police crime lab tested the stains on the bat
and confirmed they were blood; he then sent the samples to UNT Health Science Center
for DNA testing.  A forensic analyst at
UNT testified that the DNA test confirmed that the blood was Irene=s.  Neither was asked to test any other part of
the bat.





[9]When Detective Stamp
interviewed Jerald, he was still upset.





[10]Appellant=s middle name is Loretta,
which is how Irene would refer to her.





[11]Dorothy said an emergency
room doctor told the family Irene needed the respirator or she would die.





[12]In contrast to George=s testimony, Irene
testified that George was not living with her at the time.





[13]Riley also testified that
he has lights around his property that allowed him to see the area.





[14]Bobby had testified that
his car was a white Oldsmobile Cutlass Ciara.





[15]Appellant later testified
on cross that she and Jerald spent the night on the 21st at the Motel Six.





[16]She later identified him
on cross as Louis Mejia.





[17]Appellant recognized the
car as the one Jerald and Bobby drove.





[18]Appellant=s counsel argued, Athere needs to be a
showing that the content of the statement was reasonably relied upon by the
care provider as essential to the care.@  This test
was mentioned in the hearsay analysis part of De la Paz.  229 S.W.3d 795, 798B99 (Tex. App.CEastland 2007), rev=d, 273 S.W.3d 671 (Tex.
Crim. App. 2008).  In addition, later,
she argued, AI believe part of De
la Paz . . . is no longer the law . . . . 
It=s a different point of
error. . . .  That=s a separate objection.@  The Court of Criminal Appeals reversed the
part of the Eastland=s court=s opinion on the
Confrontation Clause issue; thus, it seems clear that counsel was
distinguishing between a Confrontation Clause complaint and a hearsay
complaint, and urging only the hearsay complaint.





[19]To the extent appellant=s point can be construed
as raising a Confrontation Clause complaint, that issue was not preserved at
trial.  See Tex.
R. App. P. 33.1(a)(1); Reyna v. State, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005); Geuder v. State, 115 S.W.3d
11, 14B15 (Tex. Crim. App. 2003).